## STATE OF CONNECTICUT *v.* STANLEY GRADZIK (11434)

SPEZIALE, C. J., PETERS, HEALEY, PARSKEY and GRILLO, Js.

Argued February 1—decision released April 24, 1984

*Joseph G. Bruckmann,* for the appellant (defendant).

*Katherine J. Lambert,* special assistant state's attorney, with whom, on the brief, were *Arnold Markle,* state's attorney, and *Arthur Hadden,* assistant state's attorney, for the appellee (state).

PARSKEY, J. After a jury trial, the defendant was convicted of burglary in the third degree in violation of General Statutes § 53a-103 and was sentenced to a term of imprisonment of not less than two and one-half years nor more than five years. In this appeal from that conviction the defendant claims that: (1) there was insufficient evidence for the jury to find that the defendant had entered the building and hence the trial court erred in denying the defendant's motion for judgment of acquittal; (2) the trial court's instructions to the jury regarding the lack of an eyewitness to the alleged entry violated the defendant's rights under the fifth and fourteenth amendments to the United States constitution; (3) the trial court erred in denying the defendant's motion for a mistrial on the ground that the state had failed to disclose exculpatory evidence; (4) the trial court's final comments to the jury deprived the defendant of his right to a fair trial and violated General Statutes § 51-245; and (5) the trial court's denial of the defendant's motion for disqualification of the trial judge to sentence him violated the defendant's rights under the fifth, sixth, and fourteenth amendments to the United States constitution. We find no error.

The jury could reasonably have found the following facts: On February 12, 1981, while on patrol in North Branford, Officer Burdett Rice observed an unfamiliar car in the driveway of his brother-in-law David Batty's home. This vehicle was later found to be registered to the defendant. Rice turned around and again drove past the residence, this time observing two males walking toward the rear of the house. Three minutes later, after again turning around, Rice drove up the driveway and parked behind the house. Upon exiting his car, Rice noticed that the right hatchway door leading to the cellar of the house was open. As he approached the hatchway, an individual, later identified by Rice as the defendant, exited the hatchway and fled. A second

individual, Peter Gaul,[1] then emerged from the hatchway and was apprehended by Rice. An investigation revealed that a wooden door to the cellar, located at the foot of the hatchway stairs, was open and broken at the hinge. On these steps was a truckload of firewood that had been previously thrown into the hatchway by Batty.

Later that day, Rice identified a photograph of the defendant as the individual who had fled the premises. An arrest warrant was issued and about a week later the defendant turned himself in. When the defendant was in the North Branford police station, Rice again identified the defendant as the person who had fled the scene. By substituted information, the defendant was charged with burglary in the third degree in violation of General Statutes § 53a-103.[2]

## I

To obtain a conviction of burglary in the third degree the state was required to prove beyond a reasonable doubt that the defendant had unlawfully entered a building, namely the Batty residence, with the intent to commit a crime therein.[3] General Statutes § 53a-103. At the close of the state's case, the defendant moved for judgment of acquittal on the ground that the state had failed to prove that the defendant had entered the building via the cellar door. The motion was denied. When the case went to the jury the trial judge instructed the jury that they must find that the defendant had unlaw-

---

[1] Gaul was convicted, after pleading guilty, of burglary in the third degree. The driver of the car, Robert Deloughery, was convicted, after pleading guilty, of criminal attempt to commit larceny in the third degree.

[2] "[General Statutes] Sec. 53a-103. BURGLARY IN THE THIRD DEGREE: CLASS D FELONY. (a) A person is guilty of burglary in the third degree when he enters or remains unlawfully in a building with intent to commit a crime therein.

"(b) Burglary in the third degree is a class D felony."

[3] The defendant's intent is not at issue.

fully entered the building by entering the cellar.[4] The jury returned with a verdict of guilty. On appeal the defendant claims that the court erred in denying his motion because there was insufficient evidence from which the jury could conclude that he had entered the cellar. The state counters that the motion was properly denied because there was sufficient evidence that the defendant had entered the cellar and, in the alternative, that the defendant had unlawfully entered the hatchway which is part of the building. Because we agree that the defendant's presence in the hatchway constituted an unlawful entry into the building we need not decide whether there was sufficient evidence that the defendant had entered the cellar. It is beyond cavil that the hatchway is part of the building in question. Since the defendant concedes that he was in the hatchway, the evidence was clearly sufficient to support the verdict.

The defendant contends that, since by its instruction the trial court narrowed the issue to entry into the cellar to which the state did not except, proof of the defendant's presence in the hatchway is not sufficient for conviction. We do not agree.

The trial court cannot by its instruction change the nature of the crime charged in the information. See *State* v. *Ruiz*, 171 Conn. 264, 272, 368 A.2d 222 (1976). The substituted information charged the defendant with burglary in the third degree which could have been proved by the defendant's unlawful entry into the hatchway. Though the instruction incorrectly limited the proof necessary for a conviction, on review of a

---

[4] The relevant portion of the jury charge provided: "The fact that no one actually saw the defendant breaking the door down or entering the cellar area or within the cellar area is of no significance. If you're satisfied from the evidence that you find established, [then] it is reasonable to conclude, in the course of forcing the door or there after [sic], the defendant entered the premises."

sufficiency of the evidence claim this court looks to see if the evidence supports the verdict on the crime charged. As discussed earlier, we hold that it does.

Nor does the instruction constitute reversible error. In requiring the state to prove more than that the defendant had entered the hatchway, the instruction benefited the defendant and the error was harmless. *Rapuano* v. *Oder,* 181 Conn. 515, 520, 436 A.2d 21 (1980).

## II

The defendant contends that the trial court's instructions to the jury concerning the lack of an eyewitness to the defendant's alleged entry into the cellar[5] deprived him of due process of the law. He claims that the charge was a misstatement of the law and that even if it were correct, there was not enough circumstantial evidence to warrant the charge. In view of our discussion in part I, supra, we need not discuss these claims in order to find no error. Once again, by requiring the jury to find that the defendant had entered the cellar, rather than the hatchway, the court afforded the defendant a charge more favorable than that to which he was entitled.

## III

The defendant next claims that the trial court erred in denying his first motion for a mistrial on the ground that the state had failed to disclose to the defendant exculpatory evidence in violation of *Brady* v. *Maryland,* 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). The facts underlying this claim are as follows: Officer Rice testified on direct examination that as he approached the hatchway an individual later identified as the defendant exited the hatchway and started to move "towards the right or his left . . . [A]s he moved

---

[5] The portion of the charge objected to is set out in footnote 4, supra.

to the left, he looked at me and I looked at him. Shortly after that he turned and fled to the front of the house." Later, when describing these events on cross-examination, Rice stated that as the defendant exited the hatchway the defendant "moved to his right or my left, toward the driveway side of the house . . . ." The cross-examination continued: "Q. . . . You say when you observed him face to face, you got a good look at him? A. That's correct."

During the state's rebuttal, Ronald Lefchuk, a neighbor of Batty, was called as a witness. He testified that on the day in question he was across the street from the Batty residence and he observed an individual run alongside the Batty residence "right around the front. . . . I saw him come from the back yard right around the front and . . . [run] through [a line of trees] and up the hill [on the driveway side of the house.]"

After Lefchuk's testimony both sides presented their closing arguments. The next day, as the judge prepared to instruct the jury, the defendant moved for a mistrial on the ground that the state had suppressed exculpatory evidence by failing to disclose Lefchuk's testimony when the state first became aware of it.[6] The defendant contended that Lefchuk's testimony contradicted Rice's testimony on the defendant's path of flight and that this contradiction was exculpatory in that it cast doubt on the officer's opportunity to observe the defendant and later identify him. The court found that this evidence was not exculpatory and denied the motion.

To prevail on a *Brady* claim, a defendant must show that exculpatory evidence which was material to his guilt or punishment was suppressed by the prosecution. *Brady* v. *Maryland,* supra; *State* v. *Falcone,* 191 Conn.

---

[6] The state claims it did not learn of Lefchuk until during the defendant's presentation of his case.

12, 17, 463 A.2d 558 (1983); *State* v. *Doolittle,* 189 Conn. 183, 197, 455 A.2d 843 (1983). We find no error.

We are unpersuaded that Lefchuk's testimony was exculpatory. At most it only possibly contradicted Rice's testimony on the path of flight. A close scrutiny of the transcript reveals that Rice presented two versions of the defendant's flight after he emerged from the hatchway. The one he presented on direct examination, which was corroborated by Lefchuk, described the defendant as running from the back yard along the side of the house opposite the driveway while the one he presented on cross-examination, which was in conflict with Lefchuk's testimony, described the defendant as running from the back yard along the driveway side of the house.[7] It is very possible that Rice's testimony on cross-examination was in error and that had it been called to his attention, he would have rectified this mistake.[8]

Moreover, though Lefchuk's testimony possibly contradicted Rice's on the path of flight, there was no conflict with respect to Rice's opportunity to observe the defendant. On direct examination, Rice testified that he knew there were two men in the hatchway and that he could not apprehend both. As he approached the hatchway, he decided to get a good look at the person already emerging for identification purposes, and to

[7] We are not intimating that Rice deliberately presented different versions. See footnote 10, infra.

[8] It is notable that defense counsel did not cross-examine either witness about the possible conflict or point it out to the jury in his closing argument. It appears that both the discrepancy in Rice's own testimony and the conflict between Lefchuk's testimony and Rice's testimony on cross-examination escaped counsel's notice until the day after Lefchuk testified when counsel first characterized Lefchuk's testimony as exculpatory. Similarly, this seems to have escaped the notice of the state and the court. During the argument on the motion for mistrial, it was the state's position, and the court agreed, that Lefchuk's testimony corroborated Rice's and was favorable to the state.

apprehend the second person. Rice testified that before the defendant fled, "he looked at me and I looked at him. Shortly after that he turned and fled to the front of the house." On cross-examination, Rice testified that he "keyed" on the defendant's face and that they were "eye to eye." Since Lefchuk did not observe this encounter his testimony has no bearing on Rice's consistent testimony about his opportunity to observe the defendant.

Though it is true that evidence which bears on a key witness' credibility can be exculpatory; *State* v. *Grasso,* 172 Conn. 298, 302, 374 A.2d 239 (1977); not every inconsistency is exculpatory and therefore its nondisclosure does not constitute a *Brady* violation. See *State* v. *Storlazzi,* 191 Conn. 453, 461, 464 A.2d 829 (1983). See also *United States* v. *Agurs,* 427 U.S. 97, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976). The jury had Rice's and Lefchuk's testimony about the path of flight and to the extent that it was contradictory, it was for the jury to make a determination.[9] The court did not abuse its discretion in denying the motion for mistrial.[10]

---

[9] Even if we assume, arguendo, that Lefchuk's testimony was exculpatory and material, the evidence, having come out at trial, was not suppressed. See *State* v. *Grasso,* 172 Conn. 298, 303, 374 A.2d 239 (1977). In essence, the defendant claims that, had he learned of the testimony prior to Lefchuk taking the stand, he would have realized the discrepancy and highlighted it for the jury. Ultimately the jury would have been presented with the same issue of credibility. This slight delay in revealing Lefchuk's testimony did not merit a mistrial.

[10] The defendant offers additional support for a mistrial by claiming that when the state learned of Lefchuk's testimony, "it necessarily must have realized . . . that Officer Rice was not being truthful about his opportunity to observe" the defendant and hence it obtained a conviction on the basis of false evidence. Since this ground for a mistrial was not raised at trial and review of it is not justified under *State* v. *Evans,* 165 Conn. 61, 327 A.2d 576 (1973), we will not address the merits of the claim. This does not mean that we are not troubled by the defendant's cavalier and unsubstantiated allegations of perjury by Officer Rice. Perjury and the deliber-

## IV

The facts underlying the defendant's next claim are as follows: After a period of deliberation, the jury requested additional instructions because they were having difficulty reaching a unanimous verdict. The court provided a supplemental instruction. Approximately two hours later, the jury notified the court that they were "unable to reach a unanimous verdict and [felt] further discussion would be fruitless." In response to their note the court instructed the jury that it would excuse them until the next day when they were to return to the deliberation room and continue their "efforts. . . . I know you have told me that you think a further effort would be fruitless, but sometimes the passage of time alone overnight, with an opportunity to reflect yourself upon your own thinking in the matter, sometimes results in a meeting of the mind the following day. So I think that would be helpful in this case.

"So, I'm going to excuse you until tomorrow morning at ten o'clock and ask you to return as I said, to the deliberation room. As soon as you're all there, begin your deliberations again.

"Keep in mind, overnight and this afternoon, as you leave, the caution that I have given you before. You are in the process now of discussing the case among yourselves. Your discussion and any comments that you have, should be strictly among yourselves. You should have no occasion to talk about this case with anyone else, and not even your family members, and you should confine your discussing the case just to your own membership, and no one else."

---

ate use of perjury by the state are serious charges. Not every inconsistency constitutes a falsehood. Claiming perjury, with nothing more, is inappropriate.

The defendant objected to this instruction and the next day moved for a mistrial claiming, inter alia,[11] that this supplemental instruction permitted the jurors to deliberate individually overnight, while not assembled, and within the presence of nonjurors at home, all in violation of General Statutes § 51-245[12] and in derogation of his right to a fair trial. The defendant assigns the denial of this second motion for mistrial as error.

We disagree with the defendant that the trial court instructed the jury to deliberate alone and in the presence of nonjurors. To the contrary, the court ordered the jurors to return the next day to the deliberation room to recommence their deliberations. It expressly ordered them not to discuss the case with anyone not a member of the jury. We consider the court's statement about pondering the matter overnight to be nothing more than an expression of an understanding of what jurors naturally do. To find these words to be a violation of § 51-245 would suggest that that statute prohibits the jury from thinking about the case when they are not deliberating. The court did not abuse its discretion in denying the defendant's motion for mistrial.

### V

In the defendant's final claim of error he contends that the case should be remanded for resentencing by a different judge because the trial judge impermissi-

---

[11] The defendant's other grounds for a mistrial were not briefed or presented at oral argument and as such are considered abandoned. *Sachem's Head Assn.* v. *Lufkin,* 168 Conn. 365, 366, 362 A.2d 519 (1975).

[12] General Statutes § 51-245 (a) provides: "Sec. 51-245. DUTY OF JURORS. PROHIBITED CONVERSATIONS. FINES. (a) After a cause has been committed to a jury, the jurors shall be under the charge of an officer appointed by the court, who shall permit no other person to be present with them or to speak to them when assembled for deliberation. The jurors shall not converse with any person who is not a member of the jury relative to the cause under consideration before they have returned their verdict. When the jurors have agreed upon a verdict, they shall return it to the court."

bly participated in plea negotiations and thus should have disqualified himself from sentencing the defendant. We do not agree.

Prior to trial, during the plea negotiations, the court informed counsel that if the defendant chose to plead guilty, his violation of probation[13] would be handled either in New Haven where he had been sentenced to probation or in West Haven before the same judge, at the defendant's option. The defendant, however, rejected the state's offer and it was withdrawn. After jury selection had begun, the defendant decided to accept the offer. In chambers, the court recommended to the prosecutor that since the defendant had previously rejected the offer, the state should not renew it. The court further stated that the only guilty plea it would accept was one without a sentence recommendation.[14] The defendant proceeded to trial, whereupon he was convicted.

After he was convicted, the defendant filed a motion for disqualification of the trial judge from sentencing

[13] On November 18, 1980, the defendant pled guilty to one count of carrying a dangerous weapon and to two counts of inhaling a harmful substance. The total effective sentence imposed by the trial court, *Kinney, J.,* was two to four years, execution suspended with a period of probation of four years. The defendant's conviction of burglary in the third degree in the present case formed the basis for the violation of probation charge. See General Statutes § 53a-32. After his conviction for burglary, the defendant filed a written objection to the transfer of prosecution for violation of probation to West Haven. Since Judge Kinney was the judge who had placed the defendant on probation and was also the judge who had presided over the burglary conviction that constituted the violation of probation, during the discussion on the motion for disqualification he informed counsel that he thought he was the appropriate judge to sentence the defendant on the violation of probation. General Statutes § 53a-33.

[14] Much of the discussion on the record regarding plea negotiations took place after defense counsel claimed that the judge's supplemental jury instructions; part IV, supra; were made in bad faith because the judge had allegedly participated in plea negotiations. This ground was not pursued on appeal in support of the defendant's claim of error regarding those instructions.

him. He claimed that he had a reasonable apprehension that the court would act vindictively and impose a harsher sentence because he had not pled guilty. The basis for this apprehension was both the court's purported implication that if the defendant pled guilty a different judge would sentence him on the probation violation but if he was convicted after trial Judge Kinney would sentence him on both matters, and the court's unwillingness to accept a guilty plea with a sentence recommendation. The court denied the motion. The defendant was sentenced on the burglary conviction to a term of two and one–half to five years. The defendant pled guilty to the probation violation and the court opened his earlier convictions, ordered the probation revoked and, with some modification,[15] reinstated the sentences which had been suspended.

We do not agree that the trial judge was required to recuse himself. The court indicated that it would only accept a plea agreement if there were no sentencing recommendation. Since accepting or rejecting a plea agreement is clearly within the trial court's discretion; *Lynch* v. *Overholser,* 369 U.S. 705, 719, 82 S. Ct. 1063, 8 L. Ed. 2d 211 (1961) and Practice Book §§ 694, 698; these comments hardly compel disqualification.

Similarly, the court's comments regarding the probation violation did not warrant disqualification. These statements occurred during the plea negotiations and appear to be nothing more than an explanation of the procedure for the disposition of the probation violation

---

[15] After revoking the order of probation in the carrying of a dangerous weapon conviction, the court reinstated the original sentence of two to four years. To provide some inducement for the defendant to become involved in a drug rehabilitation program upon his release, however, the court ordered execution of the sentence suspended after one year, with an additional period of three years' probation upon the condition that he immediately enter an in-patient drug program under the supervision of the probation department.

in the event of a guilty plea.[16] The explanation was not only proper but it was in the defendant's interest to be presented with all the matters relevant to a guilty plea. That the defendant read a threat into this explanation is unfortunate but not supported by the record.

If the record revealed that the judge had been an active participant in negotiating the plea, we would view this claim differently. The dangers of such participation are obvious. "In the first place, judicial participation in plea negotiations is likely to impair the trial court's impartiality. The judge who suggests or encourages a particular plea bargain may feel a personal stake in the agreement (and in the quick disposition of the case made possible by the bargain) and may therefore resent the defendant who rejects his advice. . . . Moreover, the defendant is likely to make incriminating concessions during the course of plea negotiations. . . . In the second place, judicial participation in plea discussions creates a misleading impression of the judge's role in the proceedings. 'As a result of his participation, the judge is no longer a judicial officer or a neutral arbiter. Rather, he becomes or seems to become an advocate for the resolution he has suggested to the defendant.' *United States* v. *Werker,* [535 F.2d 198, 203 (2d Cir.), cert. denied, 429 U.S. 926, 97 S. Ct. 330, 50 L. Ed. 2d 296 (1976)]." *United States* v. *Adams,* 634 F.2d 830, 840–41 (5th Cir. 1981). There is nothing in the record, however, to support a conclusion that the trial judge participated in the plea negotiations.

Moreover, the sentence imposed was eminently fair and compassionate. Although the defendant had a

---

[16] Since the probation had been imposed in geographical area number six at New Haven, the proper venue for the violation of probation would have been in New Haven. However, under Practice Book § 943, in the event of a conviction for a new offense the court presiding over that new offense may, upon motion filed by a probation officer, preside over the violation of probation also. That is ultimately what occurred in this case. See footnote 15, supra.

lengthy criminal record, including five violations of probation, and had failed to avail himself of drug rehabilitation, the court suspended the sentence after one year with the condition that the defendant enter a drug rehabilitation program. Footnote 15, supra. We cannot say that the court abused its discretion in denying the motion for disqualification.

There is no error.

In this opinion the other judges concurred.