## STATE OF CONNECTICUT *v.* FLOYD SIMMS
## (12663)

PETERS, C. J., HEALEY, DANNEHY, CALLAHAN and HAMMER, Js.

Argued October 1—decision released November 25, 1986

*John R. Williams,* with whom, on the brief, was *Sue L. Wise,* for the appellant (defendant).

*Susann E. Gill,* deputy assistant state's attorney, with whom, on the brief, were *Herbert Appleton,* assistant state's attorney, and *Bernadette Conway,* deputy assistant state's attorney, for the appellee (state).

PETERS, C. J. The principal issue in this criminal appeal is the defendant's claim that the state unconstitutionally suppressed exculpatory information. The defendant, Floyd Simms, was charged by indictment with the crime of felony murder, in violation of General Statutes §§ 53a-54c and 53a-54a (c).[1] After a trial to a jury, he was found guilty and sentenced to life imprisonment. He appeals from the judgment of this conviction. We find no error.

The jury could reasonably have found the following facts. The dead body of seventy-five year old Theodore

---

[1] "[General Statutes] Sec. 53a-54c. FELONY MURDER. A person is guilty of murder when, acting either alone or with one or more persons, he commits or attempts to commit robbery, burglary, kidnapping, sexual assault in the first degree, sexual assault in the first degree with a firearm, sexual assault in the third degree, sexual assault in the third degree with a firearm, escape in the first degree, or escape in the second degree and, in the course of and in furtherance of such crime or of flight therefrom, he, or another participant, if any, causes the death of a person other than one of the participants, except that in any prosecution under this section, in which the defendant was not the only participant in the underlying crime, it shall be an affirmative defense that the defendant: (A) Did not commit the homicidal act or in any way solicit, request, command, importune, cause or aid the commission thereof; and (B) was not armed with a deadly weapon, or any dangerous instrument; and (C) had no reasonable ground to believe that any other participant was armed with such a weapon or instrument; and (D) had no reasonable ground to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury."

"[General Statutes] Sec. 53a-54a. MURDER DEFINED. AFFIRMATIVE DEFENSES. EVIDENCE OF MENTAL CONDITION. CLASSIFICATION. . . . (c) Murder is punishable as a class A felony in accordance with subdivision (2) of section 53a-35a unless it is a capital felony."

McInnis was discovered on the grounds of St. Joseph's Cathedral in Hartford on the morning of April 3, 1982. McInnis had been employed as a caretaker and night watchman at the cathedral, and had reported on April 2 for his usual 3 p.m. to 11 p.m. shift. He was found lying in a pool of blood, with extensive wounds and lacerations all over his body. Although several witnesses testified that McInnis had always worn a gold watch and a gold ring with a light green stone, no watch or ring was found on his body. The wallet and the ring of church keys that the victim had usually carried at work were missing as well. After conducting an autopsy, the medical examiner determined that the victim's death, which had occurred on or about April 2, was caused principally by multiple blunt force injuries, a secondary cause of death being severe coronary atherosclerosis. The medical examiner also reported that the severe head injury, and certain other injuries sustained by the victim, seemed to have been caused by the sole of a shoe and that the injuries to the victim's groin were consistent with his having been "stomped on."

At the time of the incident, the defendant was a seventeen year old resident of the Community Youth House in Hartford, a house located not far from the cathedral. Several Hartford police officers arrested him on April 22, on charges unrelated to this case, at which time he made two incriminating statements to the police. He gave a third incriminating statement on April 29, while he was being detained at Litchfield Correctional Facility.

Two residents of the Community Youth House, Darryl Terrell and Carmen Durso, testified against the defendant at trial. Both stated that on April 2 they had seen the defendant leave the house by way of a second floor fire escape, and that he was wearing "Playboy" sneakers and a ski vest. Durso testified that he had seen the defendant return at about 11:30 p.m., dressed in

the same manner. Durso stated that he had overheard a conversation between the defendant and Wamon Mohagel, another house resident, in which Mohagel asked, "Do you think that we killed him or hurt him seriously or badly?" The defendant's response was, "I don't know, but if we get busted, we have a handcuff key." According to Durso, Mohagel then asked the defendant whether "they'd be able to get any money from the stuff that they got from the old man," to which the defendant answered, "I don't know, but we're going to have to do another hit pretty soon." Durso stated that the defendant had attempted to sell him a gold tone watch with a brown leather band, and a gold ring with a light green stone, on April 3, and again on April 5 or 6.

Terrell testified that during a conversation with the defendant at about 1 a.m. that night, the defendant had told him that he and two other house residents, Wamon Mohagel and Danny Jones, had robbed a night watchman at the church and had hit the old man. Terrell stated that he had seen a gold tone watch with a black or brown band, and a big ring of keys, hanging on the wall in the defendant's room, and had been told by the defendant that both items had come from the big church on Asylum Street. After their conversation, the defendant borrowed a rag from Terrell which he used to clean his sneakers with a household cleanser.

George Sams, a counselor at the Youth House, testified that during the week following April 2, he too had seen a large ring of keys on the dresser in the defendant's room, and that the defendant had told him that the keys were his. According to Sams, the defendant at that time was wearing a gold watch with a black or brown leather band.

The state's forensics expert testified at trial that he had compared fibers taken from the soles of the defend-

ant's sneakers to fibers on the shirt worn by the victim on the night he died and had determined that the fiber samples were substantially similar in color, diameter and make-up. The expert witness had also compared a photograph of the impression left on the victim's forehead with an inked impression of the sole of the defendant's right shoe and had found many similarities in the two impressions.

At trial, the defendant tendered a defense of alibi and also offered evidence of the affirmative defenses to felony murder. In his appeal, he does not contest the sufficiency of the evidence for a conviction of felony murder. Rather, he claims error on four grounds: (1) the grand jury that indicted the defendant was tainted by adverse preindictment publicity; (2) the prosecution violated its constitutional duty to disclose exculpatory information requested by the defendant; (3) the trial court improperly admitted incriminating statements made by the defendant absent a knowing, voluntary and intelligent waiver of his constitutional rights; and (4) the trial court erred in its instructions to the jury on the scope of accessorial liability under General Statutes § 53a-54c and on the reasonable doubt standard. We will consider each claim of error separately.

I

The defendant's first claim of error asserts that he was denied his constitutional right to an impartial grand jury. Because the watchman had been murdered in St. Joseph's Cathedral, and because of other emotionally-laden facts, including his age and the brutality of the murder, this case concededly engendered widespread local publicity. In order to assure that the selection of grand jurors was untainted by this extensive preindictment publicity, the defendant requested, at the initiation of the grand jury proceedings, that the trial court

voir dire each of the grand jurors individually in accordance with a submitted list of proposed questions.[2] The trial court, *B. O'Neill, J.,* denied this request because, in its view, such a procedure would cause a "certain amount of mischief." The court acknowledged, however, that this was a "case of some notoriety," and agreed to advise the grand jurors of the date and location of the incident, and to ask whether any of the grand jurors had such knowledge of the incident as to prevent them from being impartial. When the court described the incident and inquired about any prejudice the grand jurors might have harbored, no one on the panel came forward to disqualify himself.[3] The grand jury there-

[2] The proposed questions that the defendant considered most important are as follows:

"6. Are you a member of the parish of the Cathedral of St. Joseph?

"7. Are you a member of a church or other religious organization that is in any way connected with the Roman Catholic Archdiocese of Hartford?

"8. If you were to determine that the death of Theodore J. McInnis took place in the Cathedral of St. Joseph, on its premises or in an area immediately adjacent or proximate thereto, would such evidence tend to prevent you from impartially and objectively performing your function as a member of this grand jury?

"9. Will you be able to be totally impartial and objective in the performance of your duties as a grand juror if you were to find, in the course of receiving testimony, that the victim was white and the accused is black?"

[3] In his opening remarks to the grand jury, Judge O'Neill stated: "Now, Mr. Simms is charged with the crime of felony murder, allegedly occurring on April 2, 1982 in the City of Hartford. The State is represented by Attorney Herbert Appleton of the State's Attorney's Office, who resides in the City of West Hartford. The defendant is represented by Attorney Carl Eisenman of the Town of Simsbury. The alleged victim in the case is Theodore McInnis of the City of Hartford.

"Now, this matter may have been reported in the media, that is radio, television, newspapers, and you may have notice or knowledge of these reports. If you know any of us or anything about the case, if you know any of our families or anything about the incident, if you know anything of the reports of the incident or for any reason you feel because of this knowledge you cannot sit as fair and impartial members of the Grand Jury and as fair and impartial alternates of the Grand Jury, please let me know now.

"(No response)"

after indicted the defendant on charges of felony murder; General Statutes §§ 53a-54c, 53a-54a (c); on July 8, 1982.

The defendant admits that this record discloses no evidence of actual prejudice, but urges us to presume, merely because the grand jury was not subjected to the requested voir dire, that the grand jury was in fact prejudiced. Although we agree with the defendant that he was entitled to an impartial grand jury, we are unprepared to adopt a presumption of prejudice in the circumstances of this case.

This state has long recognized the constitutional right to an impartial grand jury. At the time of this incident, in April of 1982, article first, § 8, of the Connecticut constitution provided that "[n]o person shall be held to answer for any crime, punishable by death or life imprisonment, unless on a presentment of an indictment of a grand jury . . . ."[4] The constitutional requirement of indictment by a grand jury was designed "to interpose, between the state and one accused of a crime for which the punishment may be death or life imprisonment, a body of eighteen disinterested persons . . . ." *State* v. *Menillo,* 159 Conn. 264, 275, 268 A.2d 667 (1970); see *State* v. *Stepney,* 181 Conn. 268, 272, 435 A.2d 701 (1980), cert. denied, 449 U.S. 1077, 101 S. Ct. 856, 66 L. Ed. 2d 799 (1981). An individual brought before a grand jury is thus constitutionally entitled to an impartial and unbiased grand jury; *United*

---

[4] Article first, § 8, of the Connecticut constitution was subsequently amended by the seventeenth amendment to the constitution, which eliminated the grand jury system and substituted the requirement of a probable cause hearing in all cases where a sentence of death or life imprisonment might be imposed.

The seventeenth amendment to the Connecticut constitution provides in relevant part: "Section 8 of article first of the constitution is amended to read as follows . . . No person shall be held to answer for any crime, punishable by death or life imprisonment, unless upon probable cause shown at a hearing in acccordance with procedures prescribed by law . . . ."

*States* v. *Burke,* 700 F.2d 70, 82 (2d Cir. 1983); but the members of the grand jury need not be selected in any particular manner. *State* v. *Avcollie,* 188 Conn. 626, 634, 453 A.2d 418 (1982), cert. denied, 461 U.S. 928, 103 S. Ct. 2088, 77 L. Ed. 2d 299 (1983). The sole constitutional restriction on the selection of grand jurors prohibits intentional discrimination on the basis of race or class. *State* v. *Cobbs,* 164 Conn. 402, 409, 324 A.2d 234, cert. denied, 414 U.S. 861, 94 S. Ct. 77, 38 L. Ed. 2d 112 (1973).

We have never held, however, that the constitutional right to a disinterested grand jury creates a concomitant right to voir dire prospective grand jurors before their impaneling. Such a claim must be viewed from the perspective of this court's historical reluctance to interfere with the secrecy of grand jury proceedings. See, e.g., *State* v. *Maldonado,* 193 Conn. 350, 362–63, 478 A.2d 581 (1984); *State* v. *Canady,* 187 Conn. 281, 282–84, 445 A.2d 895 (1982). If we were to require a full-scale investigation of a grand jury panel upon unsubstantiated assertions that the panel had been improperly drawn, we would be departing from this historical pattern and would be opening the door to postindictment scrutiny of virtually every grand jury panel, no matter how impartial and representative in fact. *State* v. *Avcollie,* supra, 636; *State* v. *Cobbs,* supra, 409.

The law of other jurisdictions provides no support for the defendant's asserted right to an individual voir dire of prospective grand jurors. Federal courts have uniformly denied blanket requests for permission to voir dire a grand jury regarding prejudice or bias. *In re Balistrieri,* 503 F. Sup. 1112, 1114 (E.D. Wis. 1980); *Schwartz* v. *United States Department of Justice,* 494 F. Sup. 1268, 1273–74 (E.D. Pa. 1980); *United States* v. *Sweig,* 316 F. Sup. 1148, 1153 (S.D.N.Y. 1970); *United States* v. *Knowles,* 147 F. Sup. 19, 20 (D.D.C.

1957). Without denigrating the constitutional importance of an impartial grand jury, these courts have concluded that the voir dire of grand jurors would constitute an "unwarranted encroachment on the Grand Jury's independence and plenary historical authority." *Schwartz* v. *United States Department of Justice,* supra, 1275.[5] Instead of indulging in a presumption of prejudice and partiality, these courts have presumed that the possibility of any grand jury taint resulting from preindictment publicity is purged by the burden of proof imposed upon the state at trial and by the unbiased deliberations of the petit jury. *United States* v. *Brien,* 617 F.2d 299, 312–13 (1st Cir.), cert. denied, 446 U.S. 919, 100 S. Ct. 1854, 64 L. Ed. 2d 273 (1980); *Silverthorne* v. *United States,* 400 F.2d 627, 634, (9th Cir. 1968), cert. denied, 400 U.S. 1022, 91 S. Ct. 585, 27 L. Ed. 2d 633 (1971).

We therefore hold that a criminal conviction, after a full and fair trial, cannot be overturned on the ground of adverse preindictment publicity unless the defendant can make some showing of actual prejudice on the part of the grand jury. The burden of proof of prejudice must be borne by the defendant. *United States* v. *Burke,* supra, 82; *United States* v. *Myers,* 510 F. Sup. 323, 325–26 (E.D.N.Y. 1980); cf. *Sheppard* v. *Maxwell,* 384 U.S. 333, 86 S. Ct. 1507, 16 L. Ed. 2d 600 (1966).[6]

---

[5] Preindictment voir dire of grand jurors has also been discouraged on the ground that a grand jury, unlike a petit jury, is not constrained by the technical rules of evidence that are applicable at trial, and therefore may consider evidence, including pre-indictment publicity, which clearly would not be admissible in post-indictment proceedings. *United States* v. *Nunan,* 236 F.2d 576, 593 (2d Cir. 1956), cert. denied, 353 U.S. 912, 77 S. Ct. 661, 1 L. Ed. 2d 665 (1957); *In re Balistrieri,* 503 F. Sup. 1112, 1114 (E.D. Wis. 1980); *Schwartz* v. *United States Department of Justice,* 494 F. Sup. 1268, 1271 (E.D. Pa. 1980). We disagree with this reasoning because its premise is inconsistent with the requirement that the grand jury conduct its proceedings with impartiality.

[6] We recognize the difficulty of proving actual prejudice without access to the transcripts of grand jury proceedings. The defendant, however, could

We note that, in this case, although the trial court refused to conduct the extensive voir dire of the grand jurors requested by the defendant, it did acknowlege the notoriety of the case and it did take some measures to inquire into the possible impact of pretrial publicity on the panel. More pointed questioning, including more specific details of the incident, might have caused latent prejudice to surface and to be recognized. We have no way of knowing, however, whether such questioning would have been helpful to the defendant or would have been resented by the grand jurors as an unwelcome intrusion into their plenary power to conduct grand jury proceedings. We do know that the defendant has not complained of any taint of prejudice in the composition of the petit jury that convicted him of the crime with which he was charged. In these circumstances, we find no error in the defendant's grand jury indictment.

## II

The defendant's second claim of error, the ground for reversal that he most seriously presses upon us, is his contention that the state failed to disclose allegedly exculpatory information in violation of *Brady* v. *Maryland,* 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). The defendant filed a supplemental motion for disclosure on January 6, 1983, seeking, inter alia, "[a]ny information gained by the state's attorney's office, by virtue of its investigation concerning any state's witness's credibility or competency to testify as a witness, including, but not limited to the psychiatric history, mental health . . . ." The trial court, *Corrigan, J.,* granting the motion in part, ordered the state to reveal any exculpatory evidence and to provide the criminal records of all witnesses for the state. The state pro-

have developed a stronger record by submitting, for example, newspaper articles about the case or other evidence of media coverage, in order to demonstrate the nature of the preindictment publicity and its prejudicial effect.

duced the felony convictions of its witnesses but claimed that it had no psychiatric records for any of its witnesses. According to the defendant, the state suppressed the mental health records of a key witness for the state, George Sams, and thereby disabled the defendant from effectively impeaching Sams' credibility.[7] We disagree.

The state is constitutionally obligated to disclose certain information to a defendant. The principles of due process require the prosecution to disclose exculpatory evidence that is material to a defendant's guilt or punishment. *Brady* v. *Maryland,* supra, 87; *State* v. *Dolphin,* 195 Conn. 444, 455, 488 A.2d 812, cert. denied, 474 U.S. 833, 106 S. Ct. 103, 88 L. Ed. 2d 84 (1985); *State* v. *Cohane,* 193 Conn. 474, 495–96, 479 A.2d 763, cert. denied, 469 U.S. 990, 105 S. Ct. 397, 83 L. Ed. 2d 331 (1984); *State* v. *Gradzik,* 193 Conn. 35, 40, 475 A.2d 269 (1984).[8] We agree with the defendant that the rubric of exculpatory information includes information affecting the credibility of witnesses. *State* v. *Gradzik,* supra, 42; *Merrill* v. *Warden,* 177 Conn. 427, 431, 418 A.2d 74 (1979).

In order to prove a *Brady* violation, the defendant must show: (1) that the prosecution suppressed evidence after a request by the defense; (2) that the evidence was favorable to the defense; and (3) that the evidence was material. *Moore* v. *Illinois,* 408 U.S. 786, 794–95, 92 S. Ct. 2562, 33 L. Ed. 2d 706, reh. denied, 409 U.S. 897, 93 S. Ct. 87, 34 L. Ed. 2d 155 (1972).

---

[7] George Sams testified at trial that he had been convicted of conspiracy to commit murder in 1969 and was presently on life parole.

[8] The prosecution's duty to disclose exculpatory information, as set forth in *Brady* v. *Maryland,* 373 U.S. 83, 87–88, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), stems from the due process clause of the fourteenth amendment to the United States constitution. Furthermore, an independent right to disclosure of exculpatory information exists under the due process clause of the Connecticut constitution. Conn. Const., art. I, § 8; see *Michigan* v. *Long,* 463 U.S. 1032, 1041, 103 S. Ct. 3469, 77 L. Ed. 2d 1201 (1983).

In this case, the defendant, by the terms of his specific request, gave the state adequate notice that he wanted access to the psychiatric records of the state's witnesses, because such records could have had a bearing on their credibility or competency to testify at trial. More important, even in the absence of a specific request or motion by the defendant for exculpatory information, the prosecution had an ongoing constitutional duty to disclose exculpatory material to the defendant. *State* v. *Mitchell,* 200 Conn. 323, 338, 512 A.2d 140 (1986). Consequently, if the state had relevant psychiatric records of George Sams in its control, it had a constitutional obligation to disclose those records to the defendant.

These basic *Brady* principles are not presently at issue. What is at issue is the extent of the state's obligation to disclose when: (1) the information about Sams' psychiatric history was not within the exclusive custody of the state but was a matter of public record; and (2) the admissibility of that psychiatric history in the present trial was doubtful.

The psychiatric history of George Sams came to light because the defendant's appellate counsel was aware of *State* v. *McLucas,* 172 Conn. 542, 375 A.2d 1014, cert. denied, 434 U.S. 855, 98 S. Ct. 174, 54 L. Ed. 2d 126 (1977). McLucas was prosecuted for his role in the 1969 murder of a member of the Black Panther party. Id., 544. George Sams, a former member of the party, testified as a state's witness after having pleaded guilty to second degree murder. Id., 561. The *McLucas* opinion refers to testimony regarding "Sams' erratic behavior, his reputation for mental instability, his violence and his reputation for veracity." Id., 562. The opinion also notes that an unidentified psychiatrist, who had been appointed to evaluate Sams' competency, had testified at the *McLucas* trial on the issue of Sams' mental instability and propensity for violence. Id. The psy-

chiatric records referred to in *McLucas* constitute the information allegedly suppressed by the state in the present case.

The question before us is whether the state had an obligation, under *Brady,* to proffer this psychiatric history to the defendant. The record discloses no psychiatric records for Sams other than those described in *State* v. *McLucas.* The state, at oral argument in this court, expressly represented that it had complied in good faith with the defendant's disclosure requests and that it had no psychiatric records for Sams on file. Thus, the defendant has neither proved the existence of such records, nor demonstrated that the state has "suppressed" evidence, as that term has been defined. As we have previously held, "[e]vidence known to the defendant or his counsel, or that is disclosed, even if during trial, is not considered suppressed as that term is used in *Brady.*" *State* v. *Dolphin,* supra, 455–56; *State* v. *Altrui,* 188 Conn. 161, 177, 448 A.2d 837 (1982). We may presume, based on the record, that neither the defendant nor his trial counsel actually knew of the *McLucas* opinion when Sams was being cross-examined at trial. At the very least, however, counsel for the defendant can reasonably be charged with constructive knowledge of the *McLucas* decision, as it was published several years before the present case arose. Furthermore, the defendant was free to investigate the background of any state's witnesses and he had been provided a list of those witnesses for that very purpose. We therefore agree with the state that any information bearing on Sams' credibility as a witness was as available to the defendant as it was to the state, or could have been discovered through reasonably diligent research. *Kimmelman* v. *Morrison,* 477 U.S. 365, 384, 106 S. Ct. 2574, 91 L. Ed. 2d 305 (1986); *Siemon* v. *Stoughton,* 184 Conn. 547, 557, 440 A.2d 210 (1981). Because the relevant information was a matter of public

record which the defendant could have pursued without the assistance of the state, we hold that the state cannot be said to have "suppressed" evidence of Sams' psychiatric history.

Additionally, even if the state could be held to have had some duty to inform the defendant about what the *McLucas* case revealed concerning Sams' psychiatric condition in 1970, the defendant would not have proven a *Brady* violation without demonstrating the materiality of the evidence that was allegedly suppressed. The United States Supreme Court has defined the *Brady* materiality standard as requiring proof that the undisclosed evidence, viewed in the context of the entire record, would create a reasonable doubt as to the defendant's guilt. *United States* v. *Agurs,* 427 U.S. 97, 112–13, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976). The defendant relies, however, on the new materiality standard recently enunciated in *United States* v. *Bagley,* 473 U.S. 667, 682, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985), which requires proof of a reasonable probability of a different result had there been more disclosure. Invoking that test, the defendant urges us to conclude that there was a reasonable probability of a different result at trial in this case had the prosecution disclosed the psychiatric history of George Sams. We are unpersuaded. Given the passage of time between the events chronicled in *McLucas* and the time of this trial, we are by no means certain that evidence of Sams' former psychiatric history would have been admissible. The psychiatric testimony as reported in *McLucas* contains no diagnostic information. The defendant has pointed to nothing in the record that would indicate that Sams continued in later years to manifest the mental instability or the propensity for violence that is described in *McLucas.* Absent some evidence of continued mental impairment at times relevant to this incident or this trial, a trial court might reasonably have

decided that Sams' prior psychiatric history was too remote to be admissible, even for impeachment purposes. *State* v. *Piskorski,* 177 Conn. 677, 736, 419 A.2d 866, cert. denied, 444 U.S. 935, 100 S. Ct. 283, 62 L. Ed. 2d 194 (1979); see also *State* v. *Esposito,* 192 Conn. 166, 180, 471 A.2d 949 (1984); *State* v. *Storlazzi,* 191 Conn. 453, 459, 464 A.2d 829 (1983). We therefore conclude that the defendant has failed, on the present record, to establish a violation of his *Brady* rights.

## III

The defendant's third claim of error contests the admissibility, at trial, of three incriminating statements he made to the police.[9] The defendant claims that these statements should have been suppressed for two reasons. First, he asserts that his statements were made in the absence of counsel, after he had invoked his right to counsel. Second, because of his age, his below average intelligence and his inferior education, among other factors, the defendant claims that he was incapable, under any circumstances, of intelligently waiving his constitutional rights. We disagree.

The facts underlying the making of these three statements are undisputed. The first statement was an oral admission by the defendant to Hartford detectives James Malcomb and Paul Vanderheiden on April 22, following their arrest of the defendant on charges unrelated to the April 2 incident. Upon the defendant's arrest, Detective Malcomb advised him of his *Miranda* rights, which the defendant stated he understood. The police then placed the defendant in a police cruiser to take him to the police station. During the ride to the station, neither officer questioned the defendant in any way; the defendant, however, blurted out the statement, "I know what you're leading up to, the killing

---

[9] At trial, these three statements were admitted against the defendant over his objection.

of the security guard. I am not going down alone.'' Upon the defendant's arrival at the police station, after having been informed that he was a suspect in the watchman's murder, after again having been informed of his *Miranda* rights and after having signed a form waiving his *Miranda* rights, the defendant gave the police his second statement. In this statement he denied having any role in the murder but revealed certain details that proved to be incriminating.[10] The third oral statement was obtained on April 29, at Litchfield Correctional Facility, where the defendant was being detained on the unrelated charges. Again the defendant was fully advised of his *Miranda* rights but indicated his willingness to engage in further discussions of the murder incident, and provided additional incriminating information.[11]

Although this record demonstrates that the defendant, with respect to each of his three statements, was fully advised of his constitutional rights, the defendant claims that the statements were constitutionally inadmissible. Well understood constitutional principles surround the admission into evidence of statements that implicate state and federal constitutional guarantees of the privilege against self-incrimination. *Miranda*

---

[10] In his written statement made on April 22, the defendant stated that his friend Danny Jones had borrowed his sneakers and his vest on the night of April 2 and had told the defendant that he had beaten up a man at the cathedral that night. The next day, according to the defendant, Danny returned the sneakers and the vest, the latter having blood on it. The defendant admitted, in the statement, that a week later he had been with Danny when Danny robbed an old man at the cathedral. The police relied on this information and other facts contained in the statement to obtain a warrant to search the defendant's room at the Community Youth House and to seize the vest and the sneakers they found there.

[11] During his conversation with the police on April 29, the defendant admitted that he had been at the cathedral on April 2 when the old man was killed. He also offered to tell the police what they wanted to know, when his case came up, if they would have him transferred to another correctional facility.

v. *Arizona,* 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966); *State* v. *Burge,* 195 Conn. 232, 246–47, 487 A.2d 532 (1985); *State* v. *Ferrell,* 191 Conn. 37, 40–42, 463 A.2d 573 (1983); *State* v. *Acquin,* 187 Conn. 647, 650–51, 448 A.2d 163 (1982), cert. denied, 463 U.S. 1229, 103 S. Ct. 3570, 77 L. Ed. 2d 1411 (1983).[12] In the service of these principles, the police may not question an accused who is in their custody without first warning him of his constitutional rights, assuring that he understands these rights, and honoring those rights if the accused chooses to exercise them. *Miranda* v. *Arizona,* supra, 467; *State* v. *Burge,* supra, 247; *State* v. *Ferrell,* supra, 42. To effectuate these principles, it is undisputed that a statement made by a defendant during custodial interrogation is admissible only upon proof that he knowingly, intelligently and voluntarily waived his rights to remain silent and to have an attorney present. *North Carolina* v. *Butler,* 441 U.S. 369, 373, 99 S. Ct. 1755, 60 L. Ed. 2d 286 (1979); *Johnson* v. *Zerbst,* 304 U.S. 458, 464, 58 S. Ct. 1019, 82 L. Ed. 1461 (1938); *State* v. *Derrico,* 181 Conn. 151, 168, 434 A.2d 356, cert. denied, 449 U.S. 1064, 101 S. Ct. 789, 66 L. Ed. 2d 607 (1980). Invoking these principles, the defendant claims that his statements in this case should have been suppressed because they were made in the absence of counsel, after he had invoked his right to counsel.

There can be no argument about a right to counsel with respect to the defendant's first oral statement en route to the Hartford police station. The defendant does not claim that he then invoked his right to counsel.

[12] Originally, the *Miranda* warnings were grounded solely in the due process clause of the fourteenth amendment to the United States constitution. Such warnings now have an independent basis in the due process clause of the Connecticut constitution. Conn. Const., art. I, § 8; *State* v. *Burge,* 195 Conn. 232, 246 n.15, 487 A.2d 532 (1985); *State* v. *Ferrell,* 191 Conn. 37, 45 n.12, 463 A.2d 573 (1983); see *Michigan* v. *Long,* 463 U.S. 1032, 1041, 103 S. Ct. 3469, 77 L. Ed. 2d 1201 (1983).

There was no evidence of interrogation and the defendant volunteered a statement, after appropriate warnings, that fully comported with *Miranda* strictures. *Rhode Island* v. *Innis,* 446 U.S. 291, 301, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980); *Miranda* v. *Arizona,* supra, 478; *State* v. *Vitale,* 197 Conn. 396, 412, 497 A.2d 956 (1985); *State* v. *Perry,* 195 Conn. 505, 515–16, 488 A.2d 1256 (1985); *State* v. *Stankowski,* 184 Conn. 121, 131–32, 439 A.2d 918, cert. denied, 454 U.S. 1052, 102 S. Ct. 596, 70 L. Ed. 2d 588 (1981).

The evidence before us demonstrates that the defendant likewise failed to invoke a right of counsel when he gave the police his second, written statement, at the Hartford police station. Before eliciting his statement, Detective Vanderheiden expressly inquired whether the defendant had an attorney, and the defendant unequivocally responded that he did not have one and did not want one. The defendant thereafter signed a waiver form indicating that he understood his rights and agreed to waive them. In fact, the defendant at that time was being represented by counsel on a previous arrest. The defendant subsequently testified, at the suppression hearing, that he was unaware on April 22 that he then had been represented by an attorney. He further testified that, had he known of this representation, he would have requested the presence of his attorney at the April 22 interrogation. He later admitted, however, that he had not asked for the attorney who was representing him on previous charges because he had had no use for him. Viewing these facts in their totality; *State* v. *Barrett,* 197 Conn. 50, 54, 495 A.2d 1044 (1985), cert. granted, 476 U.S. 1114, 106 S. Ct. 1967, 90 L. Ed. 2d 652 (1986); *State* v. *Stankowski,* supra, 131; we conclude that they fail to demonstrate an invocation of the defendant's right to counsel on April 22.

The circumstances of the third statement equally fail to substantiate the defendant's claimed invocation of his right to counsel. The third statement was obtained from the defendant on April 29, when Sergeant Richard Poucher and Detective Malcomb visited him at Litchfield Correctional Facility to discuss the April 2 incident. When Poucher advised the defendant of his *Miranda* rights, he specifically asked him whether he was represented by an attorney on the felony murder charge. The defendant responded, "I do not have an attorney. I may be speaking with one Friday." Although he did not sign a written waiver, as he had done on April 22, the defendant indicated orally that he wished to discuss the April 2 incident with the officers, and he proceeded to do so. The defendant now argues that his express reference to a possible meeting with counsel constituted an invocation of his right to counsel within the meaning of *Edwards* v. *Arizona,* 451 U.S. 477, 484–85, 101 S. Ct. 1880, 68 L. Ed. 2d 378, reh. denied, 452 U.S. 973, 101 S. Ct. 3128, 69 L. Ed. 2d 984 (1981). That argument cannot survive in light of decisions of this court holding that the appearance of an attorney on behalf of the defendant in one proceeding in no way undermines the defendant's otherwise valid waiver of the right to counsel at an interrogation in an unrelated proceeding. *State* v. *Falby,* 187 Conn. 6, 17, 444 A.2d 213 (1982); *State* v. *Wilson,* 183 Conn. 280, 283–86, 439 A.2d 330 (1981).[13]

Even if he cannot prevail on *Miranda* grounds, the defendant claims in the alternative that all three of his

---

[13] Since we have concluded that the defendant has not demonstrated that he invoked his right to counsel during his police interrogations, we do not reach the question of whether he waived that right in his further conversations with the police. *Edwards* v. *Arizona,* 451 U.S. 477, 484–85, 101 S. Ct. 1880, 68 L. Ed. 2d 378, reh. denied, 452 U.S. 973, 101 S. Ct. 3128, 69 L. Ed. 2d 984 (1981); *State* v. *Barrett,* 197 Conn. 50, 54, 495 A.2d 1044 (1985), cert. granted, 476 U.S. 1114, 106 S. Ct. 1967, 90 L. Ed. 2d 652 (1986).

statements should have been declared inadmissible because he was intellectually incapable of intelligently giving up his right against self-incrimination. He maintains that he was unable to undertake a knowing and intelligent waiver, and that, as a minor, he was legally required to be represented by a guardian ad litem during police interrogation.

The factual basis for these claims is meager. The defendant concedes that there is no evidence on the record of his IQ, of any intellectual impairment or of any claim that he failed to comprehend the waivers. Moreover, although the defendant asserts that he is virtually unschooled, he completed the ninth grade, never having failed a grade or a course, and he testified that he was able to read and was "pretty sure" he could understand his rights if he ever read them. We note as well that the defendant is not a newcomer to the criminal justice system and that his previous arrests may be presumed to have familiarized him with standard interrogation procedures. See *State* v. *Frazier*, 185 Conn. 211, 226, 440 A.2d 916 (1981), cert. denied, 458 U.S. 1112, 102 S. Ct. 3496, 73 L. Ed. 2d 1375 (1982).

This record, in our view, fails to support the defendant's claim that, by reason of his intellectual impairment, his waivers of his constitutional rights were ineffectual. The defendant could have offered to introduce evidence, at the suppression hearing, to cast doubt on the knowing, intelligent and voluntary nature of his waivers at the time he made the contested statements. Having failed to pursue this claim when he had the opportunity to do so, he cannot now supplement the record by sheer speculation. *State* v. *Conrod*, 198 Conn. 592, 597–98, 504 A.2d 494 (1986); *State* v. *Rawls*, 198 Conn. 111, 118, 502 A.2d 374 (1985).

Finally, we can discern no legal basis for invalidating the defendant's waivers on the ground that he was not represented by a guardian ad litem during his interrogations. In considering the validity of a waiver, we look to the totality of circumstances of the waiver. Age alone does not automatically disqualify a minor from an effective waiver of his rights. *State* v. *Turcio,* 178 Conn. 116, 144–45, 422 A.2d 749 (1979), cert. denied, 444 U.S. 1013, 100 S. Ct. 661, 62 L. Ed. 2d 642 (1980); *State* v. *Oliver,* 160 Conn. 85, 94, 273 A.2d 867 (1970), cert. denied, 402 U.S. 946, 91 S. Ct. 1637, 29 L. Ed. 2d 115 (1971).

In light of the circumstances of the defendant's waivers, as discussed above, we conclude that the waivers were knowing, intelligent and voluntary. All three statements by the defendant were properly admitted at trial.

## IV

The defendant's fourth and last claim of error is a challenge to the trial court's instructions to the jury.[14] The defendant maintains that the court erred by (1) improperly incorporating elements of the crime of accessorial liability into the charge on felony murder, and (2) impermissibly lowering the state's burden of establishing proof beyond a reasonable doubt. Although the defendant submitted no relevant requests to charge and took no exceptions at trial, we review these claims because the errors alleged might result in a violation of the defendant's due process rights implicating the fairness of his trial. *State* v. *Evans,* 165 Conn. 61, 70, 327 A.2d 576 (1973).

[14] A final claim of error alleging ineffective assistance of counsel was withdrawn at oral argument in light of our holding in *State* v. *Leecan,* 198 Conn. 517, 504 A.2d 480, cert. denied, 476 U.S. 1184, 106 S. Ct. 2922, 91 L. Ed. 2d 550 (1986).

The guidelines for review of challenged jury instructions are well-defined. In the absence of a specific request to charge, we do not critically dissect the charge or scrutinize the challenged portion in isolation. *State* v. *Fleming,* 198 Conn. 255, 268, 502 A.2d 886, cert. denied, 475 U.S. 1143, 106 S. Ct. 1797, 90 L. Ed. 2d 342 (1986); *State* v. *Dolphin,* supra, 451. Rather, we review the entire charge to ascertain whether, taken as a whole, the charge adequately guided the jury to a correct verdict. *State* v. *Fleming,* supra, 268–69; *State* v. *Hines,* 187 Conn. 199, 206, 445 A.2d 314 (1982). An error in the charge requires reversal only if, in light of the charge as a whole, there is a reasonable possibility that the jury was misled in reaching its verdict. *State* v. *Fleming,* supra, 269; *State* v. *Sinclair,* 197 Conn. 574, 581, 500 A.2d 539 (1985).

The defendant claims error in the trial court's charge on the elements of the felony murder statute, General Statutes § 53a-54c. That statute provides in relevant part that: "A person is guilty of murder when, acting either alone or with one or more persons, he commits or attempts to commit robbery . . . and, in the course of and in furtherance of such crime or of flight therefrom, he, or another participant, if any, causes the death of a person other than one of the participants . . . ." The court erred, according to the defendant, in importing into this statute the definition of accessorial liability contained in the accessory statute, General Statutes § 53a-8. The court also erred, the defendant asserts, in its charge on the state's burden of proving intent as an element of accessorial liability. We are unpersuaded.

In setting forth the elements of felony murder, the trial court twice instructed the jury that it was required to find that "the defendant or one of the other participants caused the death of Theodore McInnis in the course of and *in furtherance of* a robbery or a flight

therefrom."[15] (Emphasis added.) The trial court then elaborated upon the words "other participants" by express reference to the accessory statute, General Statutes § 53a-8, explaining that a "person acting with a mental state required for a commission of an offense who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense, shall be criminally liable for such conduct . . . ."[16]

The defendant argues that the felony murder statute is a self-contained statute that does not encompass accessorial liability as defined in the accessory statute. He further argues that by incorporating accessorial liability into the charge, the trial court broadened the scope of criminal liability beyond that imposed under § 53a-54c.

We fail to see how the trial court's reference to the accessory statute unduly expanded the scope of criminal liability imposed under § 53a-54c. We concluded in *State* v. *Young*, 191 Conn. 636, 642, 469 A.2d 1189 (1983), that the "in furtherance of" phrase in § 53a-54c was designed to limit the liability of a person whose accomplice in one of the specified felonies has committed the homicidal act to those circumstances that were contemplated by the parties to the undertaking.

[15] To aid the jury in its understanding of the law, the trial court broke down the offense of felony murder into four constituent parts: first, that the defendant or another participant committed the crime; second, that the defendant was legally sane at the time of the commission of the crime; third, that the death of Theodore McInnis was caused by the defendant or one of the other participants; and fourth, that the defendant or one of the other participants caused the death of Theodore McInnis in the course of and in furtherance of a robbery or flight therefrom.

[16] "[General Statutes] Sec. 53a-8. CRIMINAL LIABILITY FOR ACTS OF ANOTHER. A person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender."

*State* v. *Valeriano,* 191 Conn. 659, 662–63, 468 A.2d 936 (1983), cert. denied, 466 U.S. 974, 104 S. Ct. 2351, 80 L. Ed. 2d 824 (1984). We did not thereby restrict the definition of "participant" under § 53a-54c, as distinct from the definition of accomplice under § 53a-8, but rather recognized a limitation on the vicarious liability of one participant in a felony for the homicidal acts of other participants. The trial court properly referred to the accessory statute only to emphasize that the mens rea element of § 53a-54c contemplates more than mere passive acquiescence in a crime by the "participants," requiring the intent to commit the underlying felony upon which the felony murder charge is predicated. *State* v. *Valeriano,* supra, 662; *State* v. *Young,* supra, 642.

The defendant additionally challenges the accessorial liability portion of the charge arguing that the trial court failed to charge properly on the state's burden of proving intent. In construing the mens rea element of accessorial liability, this court concluded in *State* v. *Teart,* 170 Conn. 332, 334–36, 365 A.2d 1200 (1976), that "to establish the guilt of the accused as an accessory . . . the state must prove criminality of intent and community of unlawful purpose." The defendant specifically takes issue with the portion of the charge on the element of larceny, in which the court instructed: "As to the third element, with the intent to deprive Mr. McInnis of property . . . a person acts intentionally with respect to a result or to conduct . . . when his conscious objective is to cause such result or to engage in such conduct. . . . [W]e can't look into a person's mind to determine what he intends the result of his act to be, so *we must infer* such intention from the surrounding circumstances." (Emphasis added.) The defendant maintains that rather than emphasizing the state's burden of *proving* intent, as set forth in *Teart,* the trial court directed the jury to a verdict

on the issue of intent by stating that it "must infer" intent. We conclude, however, that the instructions were clear with respect to the state's burden of proving intent. The trial court correctly suggested to the jury that the only meaningful way to ascertain intent is to infer it from the circumstances of the incident. With that suggestion in mind, the jury remained free to draw its own inferences as to the intent of the defendant. Viewed as a whole, the charge on accessorial liability adequately informed the jury of the intent, and degree of participation, required to hold a person criminally liable under the felony murder statute.

The defendant also attacks the jury instructions on the ground that the trial court unconstitutionally diluted the burden of proof regarding the reasonable doubt standard. *Sandstrom* v. *Montana,* 442 U.S. 510, 99 S. Ct. 2450, 61 L. Ed. 2d 39 (1979). The defendant submitted no request to charge on the reasonable doubt standard but contends that, as a result of *State* v. *DelVecchio,* 191 Conn. 412, 419, 464 A.2d 813 (1983), the trial court was required to charge that the state must convince the factfinder " 'to reach a subjective state of near certitude of the guilt of the accused . . . .' " Id., quoting *Jackson* v. *Virginia,* 443 U.S. 307, 315, 99 S. Ct. 2781, 61 L. Ed. 2d 560, reh. denied, 444 U.S. 890, 100 S. Ct. 195, 62 L. Ed. 2d 126 (1979). We only recently had the occasion to consider that issue fully and resolved it against the defendant. *State* v. *Ryerson,* 201 Conn. 333, 342, 514 A.2d 337 (1986).

We are convinced, furthermore, that the trial court's charge, read in its entirety, provided the jury with adequate guidance on the reasonable doubt standard. In its initial discussion of the general principles that govern jury deliberations, the trial court explained to the jury that "the burden is on the State, and each element of the charge against the defendant must be proved by the State by proof beyond a reasonable doubt. If the

proof of even one element of the charge is lacking, you must find the defendant not guilty." The trial court subsequently charged that "[t]here are four elements which the State must prove beyond a reasonable doubt to sustain a conviction" under the felony murder statute, and reiterated that burden of proof at least nine additional times in its instructions to the jury. Despite the conceded accuracy of these repeated instructions on the reasonable doubt standard, the defendant argues that the trial court erred in the single instruction, "it's not necessary for the State to prove the absolute guilt of the defendant nor guilt with certainty." Not only was that portion of the charge an accurate statement of the law, but considering the charge as a whole, we conclude that the jury was adequately and fairly instructed on the state's burden of proof beyond a reasonable doubt.

The defendant alleges two further errors concerning burdens of proof. First, he claims that in summarizing the evidence and the applicable legal principles, the trial court unconstitutionally shifted the burden of proof by not instructing the jury that all facts and evidence must be proven beyond a reasonable doubt. The court instructed the jury that reasonable doubt is doubt "which is founded on the evidence and flows naturally from the evidence or lack" thereof, and that it is "not a slight doubt, nor a possible doubt, nor is it a surmise, a guess or a conjecture . . . ." Although we have noted that such attempts to explain the term "reasonable doubt" generally fail to clarify its meaning; *State* v. *Ryerson,* supra, 342; those explanations do not result in error if they adequately convey the meaning of reasonable doubt. We conclude that the trial court's numerous and accurate repetitions of the reasonable doubt standard sufficiently conveyed the meaning of that standard, even though the trial court failed to charge specifically that all the facts and evidence must be proven beyond a reasonable doubt.

The defendant finally claims that the trial court improperly instructed the jury on the defendant's burden of proving an affirmative defense. In its instructions on the relevant burden of proof, the court charged as follows: "The defendant has the burden of proving this affirmative defense by a fair preponderance of the evidence, which is that evidence which is more weighty, the more probable, the more reasonable or the more credible. As you can see, it doesn't come up to that proof beyond a reasonable doubt." The defendant argues that the jury was misled because the trial court failed to apprise the jury fully of the minimal amount of evidence required to sustain the preponderance of the evidence burden. Although the court did not state exactly how much evidence was required, this instruction certainly made clear to the jury that less evidence is required to sustain the fair preponderance burden than the reasonable doubt burden. This instruction also properly indicated to the jury that the defendant need only show that the evidence in support of his affirmative defense was "more weighty, more probable, more reasonable or more credible" than the evidence presented by the prosecution.

There is no error.

In this opinion the other justices concurred.