******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

RAKSHITT CHUGH *v.* AASHISH KALRA ET AL.
(SC 20562)

Robinson, C. J., and McDonald, D'Auria,
Mullins, Kahn and Keller, Js.

*Syllabus*

The plaintiff C sought to recover compensatory and punative damages from the defendants, K and T Co., for, inter alia, breach of a partnership agreement in connection with a failed business venture. In 2004, C and K had agreed to form a partnership to pursue investment opportunities. In furtherance of that agreement, they established numerous companies, including and principally T Co., an investment advisory company incorporated in the Cayman Islands. C and K each held a 50 percent equity interest in T Co. through entities controlled by C and K. The shares of stock representing C's interest were owned by A Co. and H Co., and the shares of stock representing K's interest were owned by P Co. Over time, C and K's relationship deteriorated, and, in 2012, with no notice to C, T Co.'s board of directors voted to remove C as a director, which left K exclusively in charge of T Co. Thereafter, K proceeded to treat T Co. and its assets as his own, and C was excluded from any involvement in T Co.'s affairs. A Co. and H Co. subsequently filed a petition in the Grand Court of the Cayman Islands to wind up T Co. and to liquidate and divide its assets between K and C. P Co. opposed the petition by asserting as an affirmative defense that C had breached his fiduciary duty to T Co. in numerous ways. The Cayman Islands court granted the petition and rejected P Co.'s affirmative defense, concluding that there was no merit to any of the allegations against C. Meanwhile, K, through P Co., brought an action in federal court against C, A Co., and other related entities. T Co. was thereafter substituted as the plaintiff in the federal action and claimed that C had breached his fiduciary duty to T Co. in numerous ways. T Co.'s specific allegations against C substantially reprised the allegations P Co. had asserted in the winding up proceeding. Following the decision of the Cayman Islands court, the District Court granted the motion for summary judgment filed by the defendants in the federal action on the ground that T Co. was collaterally estopped from pursuing its claims. While the federal action was still pending, C filed the present action against K and T Co., alleging, breach of partnership agreement, breach of fiduciary duty, and libel per se. The libel claim was predicated on a 2013 press release K had issued following the decision of the Cayman Islands court, in which K accused C of stealing T Co.'s customer database and misappropriating its business opportunities, and of paying Cayman Islands liquidators to interfere in the federal action. Following a trial, at which C's expert witness on damages, S, testified that the press release had cost C more than $20 million in lost profit, the jury returned a verdict in favor of C, awarded him $9.4 million in damages, and authorized the imposition of punitive damages, which the trial awarded in the amount of approximately $3 million. K filed a motion to set aside the verdict, arguing, with respect to the verdict on the libel claim, that the record was devoid of evidence supporting S's testimony regarding lost profit because his testimony was predicated on the false assumption that C's hedge fund and private equity fund had $250 million under management in 2012 when it was undisputed that C and his companies had no money under management at that time. The trial court denied K's motion to set aside the verdict, concluding that any error involving the admission of S's testimony was harmless because it was clear that the jury, having awarded C only $4 million in compensatory damages in connection with the libel claim, did not fully accept S's testimony and because, although the jury was instructed that it could award C compensatory damages only if he proved that he lost profits as a result of the harm to his reputation from the press release, that instruction was an incorrect statement of the law, as C was not required to prove actual damages or lost profits in a libel per se case. Thereafter, the trial court rendered judgment for C, from which K appealed. *Held*:

1. K could not prevail on his claim that C's claims in the present action were barred by the federal compulsory counterclaim rule (Fed. R. Civ. P. 13 (a) (1)) on the ground that they were compulsory counterclaims in the federal action, as that rule was inapplicable because there had been no decision on the merits of the claims T Co. asserted in the federal action; in light of the equitable principles of res judicata, estoppel, and waiver underlying rule 13 (a) (1), a court need not apply the rule when to do so would be unjust, such as when a decision on the merits was not rendered in the prior action, and, therefore, regardless of whether K had been a party to the federal action, rule 13 (a) (1) would not bar C's claims in the present action because the District Court determined that T Co. was collaterally estopped from pursuing it claims in the federal action, and it would be anomalous for this court to conclude that C's claims were barred by principles of res judicata, estoppel, or waiver due to C's failure to assert them as counterclaims in an action that itself was barred by those principles.

2. There was no merit to K's claims that C's breach of partnership agreement and breach of fiduciary duty claims failed as a matter of law under *Karanian* v. *Maulucci* (185 Conn. 320), in which the court indicated that, if partners adopt the corporate form to insulate against personal liability, they cease to be partners, and that any partnership C and K created ceased to exist when they incorporated T Co., among other entities, in 2006: *Karanian* did not control C's claims because, unlike the partners in that case, who intended to and did reorganize their partnership into a corporation, there was no evidence in the present case that C and K ever intended to adopt the corporate form in place of their partnership, but, rather, the evidence indicated that C and K's partnership was an overarching entity comprised of numerous companies owned by C, K, and their families, acting in concert to further the remunerative goals of the partnership, and K cited no authority holding that a partnership cannot operate in such a manner; moreover, insofar as K claimed that the evidence did not support a finding that he and C were ever partners, although the evidence of a partnership was not overwhelming, it was sufficient to support the jury's finding of an oral agreement between C and K to carry on, as co-owners, a business for profit and that they carried on that business from 2004 until at least 2013.

3. The trial court abused its discretion in admitting S's testimony on damages with respect to C's libel per se claim: it was undisputed that S's testimony that C sustained more than $20 million in lost profit as the result of K's 2013 press release had no basis in fact; moreover, the trial court improperly instructed the jury that it could award special damages only if it found that C had proven lost profit and that instructional error was not harmless, as this court could not conclude that the jury would have awarded C $4 million in general damages in connection with C's libel claim but for that error, there was no other evidence to support the award for lost profit, and, therefore, the damages award could not stand; furthermore, because the record revealed that a component of the trial court's punitive damages award was a success fee for C's counsel in the amount of 25 percent of the total compensatory damages award, which included the $4 million award for C's libel claim, the punitive damages award also could not stand; accordingly, the judgment was reversed as to C's libel claim and the case was remanded for a new trial on that claim and for a hearing in damages.

Argued October 13, 2021—officially released April 12, 2022

*Procedural History*

Action to recover damages for, inter alia, breach of a partnership agreement, and for other relief, brought to the Superior Court in the judicial district of Hartford and transferred to the Complex Litigation Docket, where ARC Capital, LLC, and Peak XV Capital, LLC, were added as plaintiffs; thereafter, the court, *Schuman, J.*, granted the defendants' motion to dismiss certain counts of the complaint; subsequently, the plaintiffs withdrew the complaint in part; thereafter, the court, *Schuman, J.*, granted in part the defendants' motion for summary judgment and rendered judgment thereon;

subsequently, the court, *Schuman, J.*, denied in part the defendants' motion to preclude certain evidence; thereafter, the case was tried to the jury before *Schuman, J.*; verdict for the named plaintiff; subsequently, the court, *Schuman, J.*, denied the named defendant's motion to set aside the verdict and for judgment notwithstanding the verdict, and rendered judgment for the named plaintiff, from which the named defendant appealed. *Reversed in part*; *further proceedings.*

*John W. Cerreta*, with whom was *Joseph T. Nawrocki*, for the appellant (named defendant).

*John G. Balestriere*, pro hac vice, with whom were *Stefan Savic* and, on the brief, *Matthew W. Schmidt*, pro hac vice, for the appellee (named plaintiff).

*Opinion*

KELLER, J. This case is the latest in a series of cases arising out of a failed business venture between the named plaintiff, Rakshitt Chugh,[1] and the named defendant, Aashish Kalra.[2] Chugh commenced the present action seeking compensatory and punitive damages for, inter alia, breach of partnership agreement, breach of fiduciary duty, and libel per se. A jury found in favor of Chugh on those three counts, awarding him damages in the amount of $9,400,000[3] and authorizing the imposition of punitive damages, which the trial court awarded in the amount of $2,965,488.29. On appeal,[4] Kalra claims that the trial court improperly denied his motions to set aside the verdict and for judgment notwithstanding the verdict because (1) Chugh's claims are barred by the compulsory counterclaim rule set forth in rule 13 (a) (1) of the Federal Rules of Civil Procedure,[5] (2) as a matter of law, no partnership existed between the parties during the relevant time frame, and (3) with respect to the libel claim, the trial court improperly admitted the testimony of Chugh's expert witness on damages because there was no evidence to support the testimony. We agree with Kalra's third claim and, accordingly, reverse in part the judgment of the trial court.

Because issues related to the underlying action have been litigated on prior occasions in numerous other forums,[6] when appropriate, we quote directly from the decisions in those cases in setting forth the relevant facts and procedural history. Chugh and Kalra, both of whom are naturalized citizens of the United States, were born in India but immigrated to the United States to pursue postsecondary educational and employment opportunities. In 2002, Chugh's brother, who had attended high school with Kalra in India, introduced them in New York City. The two men became friends, and, between 2002 and 2004, Kalra worked as a consultant for Byte Consulting, Inc., a company founded by Chugh in 2000. By 2004, they were meeting nearly every day for lunch. It was during one of their lunch meetings, in early 2004, that they agreed to form a partnership to pursue investment opportunities in India. At the time, India had just announced that it would open its doors to foreign investment in real estate and infrastructure projects in early 2005, an opportunity that they saw themselves as uniquely positioned to exploit. They agreed that theirs would be a 50/50 partnership and that all strategic decisions relating to the business, including where to set up offices and whom to hire, would have to be unanimous.

In furtherance of the partnership agreement, Chugh and Kalra established numerous companies around the world.[7] Principal among them was Trikona Advisors Limited (TAL), an investment advisory company incorporated in the Cayman Islands. "Each man held a [50] percent equity stake in TAL through entities controlled

by them. Chugh's shares were owned by ARC Capital, LLC (ARC Capital), and Haida Investments [Limited (Haida)], and Kalra's shares were owned by Asia Pacific [Ventures Limited (Asia Pacific)]. At the same time, the two men formed Trinity Capital [PLC (Trinity)], a closed-end fund listed on the London Stock Exchange, through which they solicited investments. Kalra and Chugh managed Trinity through TAL. Trinity paid TAL a fee for its management services, calculated at [2] percent of Trinity's net asset value plus a performance fee.

"The 2008 economic crisis took its toll on TAL and soured the relationship between Chugh and Kalra. Trinity's shareholders began pressuring the Trinity board [of directors (board)] to sell the company's assets and [to] distribute capital which, while it might benefit the shareholders, would reduce TAL's management fees by lowering Trinity's net asset value. Chugh and Kalra differed on how to respond to the Trinity board's proposed asset sale: Kalra opposed the move, while Chugh wanted to be more conciliatory to the shareholders. TAL tried to prevent the sell-off by acquiring the shares of [QVT Financial LP (QVT)], one of Trinity's main shareholders, but the deal collapsed when TAL could not secure the necessary financing. Frustrated, Kalra advocated taking legal action against QVT for breach of contract, but was ultimately dissuaded from that course by Chugh and outside legal counsel." *Trikona Advisors Ltd.* v. *Chugh*, 846 F.3d 22, 26–27 (2d Cir. 2017).

"The souring of Kalra and Chugh's relationship culminated on January 11, 2012, when, with no notice to Chugh, TAL's board of directors voted to remove him as a director. This left Kalra exclusively in charge of TAL. Thereafter, Kalra proceeded to treat TAL and its assets as his own and Chugh was excluded from further involvement in the business." Id., 27. "TAL's collapse spawned a number of legal proceedings in the United States and abroad, [including] a [winding up] proceeding in the Cayman Islands and [a] federal civil [action] in Connecticut . . . ." Id.

"On February 13, 2012, ARC [Capital] and Haida, which held Chugh's TAL shares and were controlled by Chugh, filed a petition in the Grand Court of the Cayman Islands (Cayman court), seeking to 'wind up' TAL, a Cayman corporation. The [petition] sought to liquidate the business and [to] divide its assets between Chugh and Kalra. Asia Pacific, which held Kalra's TAL shares and was controlled by Kalra, opposed [the] petition. Under Cayman Islands law, a court may order a company to be wound up if it is 'of [the] opinion that it is just and equitable' to do so. . . . [ARC Capital and Haida] argued to the Cayman court that it would be just and equitable to liquidate the company because: (1) TAL had experienced a 'loss of substratum,' i.e., a

loss of its ability to 'carry on the business for which it was established,' due to its dire financial condition and the complete breakdown in trust between Kalra and Chugh; (2) Kalra had wrongfully caused Chugh to be removed from TAL's board and thereby deprived Chugh of his 'legitimate expectation of being involved in [TAL's] management'; and (3) after he had removed Chugh from the board, Kalra proceeded to misuse TAL's assets for his sole benefit.

"[Asia Pacific] opposed the [winding up of TAL] by asserting the affirmative defense that Chugh had breached his fiduciary duty to TAL in several ways, and that his removal from the board was therefore justified. Specifically, [it] argued that: (1) Chugh intentionally sabotaged TAL's attempt to acquire [QVT's] shares in Trinity and had 'caused' TAL to pay QVT $2 million for covenants of 'extremely limited value'; (2) Chugh had later 'prevented' TAL from bringing suit against QVT for breach of contract, over Kalra's objections; (3) Chugh 'forced' Kalra to agree to an unfavorable settlement with Trinity in the breach of contract arbitration arising out of [a] failed [business] deal; and (4) Chugh 'stole' TAL's assets and customer information for use in establishing Peak XV [Capital, LLC (Peak XV) and other entities] and interfered in the distribution of payments due to Kalra. [Asia Pacific] framed these arguments as jurisdictional defenses, arguing that if any one of these allegations were true, Chugh would be precluded from invoking the Cayman court's equitable jurisdiction under the doctrine of unclean hands.

"The Cayman court tried the [winding up] proceeding over seven days in January of 2013. At the trial's conclusion, the court granted [the] petition. It found that 'each of' [ARC Capital and Haida's] allegations was supported by evidence, and that these allegations 'taken together' supported a finding that it was just and equitable to wind up TAL.[8] It also rejected each of [Asia Pacific's] affirmative defenses, concluding that there was 'no merit whatsoever [to] the allegations made against . . . Chugh.' " (Citation omitted.) Id., 27–28. Indeed, the Cayman court found that Asia Pacific's allegations against Chugh, including its claim that Chugh had stolen TAL's assets and destroyed its business, were "completely at odds with the evidence of what actually happened . . . ." *In re Trikona Advisors Ltd.*, Grand Court of the Cayman Islands, Docket No. FSD 18 of 2012 (AJJ) (January 31, 2013). The court concluded that, in fact, it was Kalra who had engaged in "blatantly improper self-dealing," calling Kalra's testimony to the contrary "disingenuous" and his evidence "wholly unreliable." Id. The court further stated that, after listening to Kalra testify over the course of several days, it had come to the conclusion that there was nothing he would not do, "no matter how dishonest, to ensure that . . . Chugh . . . [is] excluded from any share in [TAL's] remaining [net asset value]." Id. It further stated that Kalra had

commenced an action in the United States District Court for the District of Connecticut against Chugh in which he had asserted all of the baseless allegations against Chugh that he had asserted in the winding up proceeding. See id. The court described Kalra's action in the District Court as "a thoroughly dishonest abuse of process." Id. On May 15, 2013, the Cayman court issued a "Default Costs Certificate," ordering Asia Pacific to pay ARC Capital's and Haida's litigation expenses in the winding up proceeding in the amount of $760,067.65.[9]

As the Cayman court indicated, "[o]n December 28, 2011, two months before the commencement of the [winding up] proceeding . . . Kalra, through Asia Pacific, sued . . . [Chugh, ARC Capital, and other related entities (Chugh defendants)] in the [D]istrict [C]ourt in Connecticut. After TAL's board removed Chugh, TAL was substituted as [the] plaintiff. TAL's . . . operative complaint . . . assert[ed] eleven causes of action against the Chugh [d]efendants sounding in breach of fiduciary duty, aiding and abetting breach of fiduciary duty, unfair competition, theft of trade secrets, civil conspiracy, conversion, statutory theft, unjust enrichment, and abuse of process. TAL alleged that Chugh breached his fiduciary duty by: (1) undermining TAL's negotiating positions in the QVT [deal] and [another business deal]; (2) causing TAL to enter into an unfavorable settlement of its claims against Trinity; (3) interfering with payments due to Kalra; and (4) misappropriating TAL's customer information and assets in the course of founding Peak XV to unfairly compete with TAL. These claims substantially reprised the allegations [Asia Pacific] asserted as affirmative defenses to [the winding up] petition in the [Cayman court].

"Following the ruling of the Cayman court in the [winding up] proceeding . . . the Chugh [d]efendants moved for summary judgment in the [D]istrict [C]ourt based on collateral estoppel. They argued that in deciding the petition the Cayman court had already made findings of fact in Chugh's favor on all of [the] assertions regarding TAL's collapse, and that [TAL] was therefore collaterally estopped from relitigating those factual disputes. The [D]istrict [C]ourt agreed, and . . . granted [the] motion for summary judgment." *Trikona Advisers Ltd.* v. *Chugh*, supra, 846 F.3d 28–29. The United States Court of Appeals for the Second Circuit affirmed the District Court's judgment. Id., 35.

On January 8, 2014, while the federal action was still pending, Chugh filed the underlying action against the defendants, alleging, inter alia, breach of partnership agreement, breach of fiduciary duty, and libel per se.[10] The libel claim was predicated on a March 13, 2013 press release Kalra had issued, following the Cayman court's ruling, in which Kalra accused Chugh of stealing

TAL's customer database and misappropriating its business opportunities. He also accused Chugh of paying the Cayman Island liquidators "$500,000 to interfere in the Connecticut litigation [then pending in the District Court] against [Chugh]." The trial court subsequently stayed the state court proceeding pending the outcome of TAL's postjudgment motions and appeal in the federal action. Following the lifting of the stay, the defendants filed a motion for summary judgment in which they argued, inter alia, that Chugh's claims[11] were barred by rule 13 (a) (1) of the Federal Rules of Civil Procedure because all of the claims were compulsory counterclaims in the federal action. They further argued that Chugh's breach of partnership agreement and breach of fiduciary duty claims failed as a matter of law because Chugh and Kalra never entered into a partnership agreement and that, even if they had, the agreement ended as a matter of law in 2006 when TAL incorporated in the Cayman Islands because, under *Karanian* v. *Maulucci*, 185 Conn. 320, 323–24, 440 A.2d 959 (1981), a company cannot be both a partnership and a corporation at the same time. Finally, the defendants argued that the libel claim also failed as a matter of law because the 2013 press release addressed a matter of public concern, and, therefore, any statement contained therein was constitutionally protected speech. They further argued that they were entitled to summary judgment on the libel claim because truth is a complete defense to libel, and the press release was an "essentially true" recitation of the federal complaint.

The trial court denied in part the defendants' motion for summary judgment. With respect to their contention that Chugh's claims were compulsory counterclaims in the federal action, the court concluded that Chugh was not required to assert them in the federal action because Kalra was not a party to that action "and there is no authority squarely holding that a party must cite in a nonparty to assert compulsory counterclaims against the nonparty." In light of the court's determination that rule 13 (a) (1) of the Federal Rules of Civil Procedure was inapplicable because Kalra was not an opposing party in the federal action, it did not address Chugh's assertion that the rule also was inapplicable because Chugh's claims in the present case did not arise out of the same transaction or occurrence that was the subject matter of the federal complaint.

The trial court also denied the motion for summary judgment with respect to the defendants' contention that, under *Karanian*, any partnership between the parties ended with TAL's incorporation. Citing *Bartomeli* v. *Bartomeli*, 65 Conn. App. 408, 783 A.2d 1050 (2001), the court concluded that merely because a company cannot be both a corporation and a partnership does not mean that the partnership between Chugh and Kalra ended with TAL's incorporation. Whether the partnership continued to exist after 2006, the court concluded,

was a genuine issue of material fact for the jury to decide. The court also noted that, pursuant to Chugh's theory of the case, the partnership was not congruent with TAL but, rather, consisted of all of the companies comprising the Trikona Group, such that TAL's incorporation could not have been a superseding event for the partnership. Finally, the court rejected the defendants' argument that they were entitled to summary judgment on the libel claim because the statements contained in the 2013 press release involved a matter of public concern, and, as such, they were protected by the first amendment to the federal constitution. The court explained that the first amendment "does not absolutely bar defamation claims against public figures or claims involving matters of public concern but, rather, merely affects the standard of proof" and whether the standard was met in this case was a question of fact for the jury. The court similarly rejected the defendants' contention that they were entitled to summary judgment because the statements contained in the press release were factually true, explaining that whether the statements were true was also a question of fact properly reserved for the jury.

After the jury returned a verdict in favor of Chugh on the breach of partnership agreement, breach of fiduciary duty, and libel claims, Kalra filed a motion to set aside the verdict on the same grounds asserted in the motion for summary judgment. Additionally, Kalra argued that the court should set aside the verdict as to the libel claim on the ground that the record was devoid of evidence supporting the testimony of Chugh's expert witness on damages, Professor Fabio Savoldelli, that the 2013 press release cost Chugh between $20.2 and $27.7 million in lost profits. Kalra argued that Savoldelli's testimony was predicated on the false assumption that Chugh's hedge fund and private equity fund had $250 million under management in 2012 when, in fact, it was undisputed that Chugh and his companies had no money under management in 2012. He further argued that "Savoldelli calculated damages based on an assumption that Chugh raised capital through 2012 and then invested that money thereafter." Given that assumption, Kalra argued, "the 2013 press release could not conceivably have affected Chugh's ability to raise capital through 2012."

The trial court denied Kalra's motion to set aside the verdict. Although the court acknowledged that Kalra's argument for setting aside the verdict as to the libel claim had "strong logical appeal," it concluded that any error involving the admission of Savoldelli's testimony was harmless because it was clear that the jury, having awarded Chugh only $4 million in compensatory damages, "did not fully accept Savoldelli's testimony . . . ." The trial court further concluded that Savodelli's testimony was harmless because, although the jury was instructed that it could award Chugh compensatory

damages only if Chugh proved " 'that he lost profits as a result of the harm that the statement in question did to his reputation,' " that instruction was an incorrect statement of the law, and, in fact, Chugh "was not required to prove actual damages or lost profits in a libel per se case."

On appeal, Kalra renews his claims before the trial court that (1) Chugh's entire action is barred by the federal compulsory counterclaim rule, (2) Chugh's breach of partnership agreement and breach of fiduciary duty claims fail as a matter of law under *Karanian*, and (3) there was no evidence to support the testimony of Chugh's expert witness on damages relative to the libel claim, and, therefore, the trial court abused its discretion in admitting that testimony. We address each claim in turn.

I

We begin with Kalra's claim that the trial court incorrectly concluded that Chugh's claims were not compulsory counterclaims in the federal action because Kalra was not a party to that action. Rule 13 (a) (1) of the Federal Rules of Civil Procedure provides in relevant part that "[a] pleading must state as a counterclaim any claim that—at the time of its service—the pleader has against *an opposing party* if the claim: (A) arises out of the transaction or occurrence that is the subject matter of the opposing party's claim; and (B) does not require adding another party over whom the court cannot acquire jurisdiction." (Emphasis added.) Kalra argues that, in applying this rule, federal courts have held that the phrase "opposing party" should be construed liberally to include not only parties who were formally named in the prior action but any party who was in privity with the named party or had control over the action. See *Metropolitan Life Ins. Co.* v. *Kubichek*, 83 Fed. Appx. 425, 431 (3d Cir. 2003) ("the rationales supporting a liberal reading of 'transaction or occurrence' in [rule] 13 (a) should also apply to 'opposing party,' such that the potential counterclaimant is obligated to assert his or her counterclaim against even an unnamed party if it arises out of the same transaction or occurrence and if the unnamed party is the functional equivalent of the named party, is controlling the litigation, or is an alter ego of the named party"). But see 6 C. Wright et al., Federal Practice and Procedure (3d Ed. 2010) § 1404, pp. 13–14 ("The first sentence of [r]ule 13 (a) requires . . . a pleading to state a counterclaim that the pleader has against an 'opposing party' at the time of its service. The federal courts have not given a definitive answer to the question of who is an opposing party for purposes of a counterclaim, but the point has caused relatively few difficulties." (Footnote omitted.)). Chugh responds that the trial court correctly determined that rule 13 (a) (1) did not bar his claims in the present case because Kalra was not a party to the fed-

eral action. He further contends that rule 13 (a) (1) is inapplicable for the additional reason that his claims in the present case do not arise out of the same transaction or occurrence that was the subject matter of the federal complaint. We conclude that rule 13 (a) (1) is inapplicable because there was no decision on the merits in the federal action. Accordingly, we need not decide whether Kalra was an "opposing party" under a liberal reading of rule 13 (a) (1), or whether Chugh's claims in the present case arose out of the same transaction or occurrence as the complaint in the federal action.

We begin our analysis by noting that Connecticut is not a compulsory counterclaim state. "In Connecticut, the fact that a defendant in a prior action did not assert a related cause of action in that prior action does not foreclose the defendant from asserting those claims in a new action filed in the future. As explained in the commentary to the Restatement (Second) of judgments: 'The justification for the existence of such an option is that the defendant should not be required to assert his claim in the forum or the proceeding chosen by the plaintiff but should be allowed to bring suit at a time and place of his own selection.' 1 Restatement (Second), [Judgments] § 22, comment (a), pp. 186–87 [1982]." (Footnote omitted.) *State* v. *Bacon Construction Co.*, 160 Conn. App. 75, 88, 124 A.3d 941, cert. denied, 319 Conn. 953, 125 A.3d 532 (2015); see also *Lowndes* v. *City National Bank*, 79 Conn. 693, 696, 66 A. 514 (1907) ("[w]hile the law encourages, it does not compel, the settlement of all controversies between the same parties by a single action"); *Hansted* v. *Safeco Ins. Co. of America*, 19 Conn. App. 515, 520 n.4, 562 A.2d 1148 ("[b]ecause Connecticut does not have a compulsory counterclaim rule . . . [the plaintiff] cannot be precluded from bringing the present claim on the ground that he failed to bring [it as] a counterclaim in [the prior action]" (citation omitted)), cert. denied, 212 Conn. 819, 565 A.2d 540 (1989).

Remarkably, this is the first time that this court has been asked to consider the applicability of rule 13 (a) to, and its preclusive effect on, a state court proceeding. Other state appellate courts that have considered this issue, however, generally have held that the rule ought to be applied in the same manner that it is applied by the federal courts. See, e.g., *Nottingham* v. *Weld*, 237 Va. 416, 420, 377 S.E.2d 621 (1989) ("It has been held that a state court must give a federal court order, dismissing a diversity case for failure to prosecute, the same preclusive effect it would have been given in the federal courts, even though state law would have permitted the maintenance of a subsequent action following a dismissal by that state's courts. . . . Although courts have disagreed, the majority, and we think the better view is that the forum court must look to the original court's construction of its compulsory counterclaim rule, and accord it full faith and credit." (Citation

omitted; footnote omitted.)). But see *Van Pembrook* v. *Zero Mfg. Co.*, 146 Mich. App. 87, 105, 380 N.W.2d 60 (1985) (rejecting claim that principles of comity or full faith and credit required Michigan Court of Appeals to give effect to Missouri compulsory counterclaim rule: "[i]n recognizing and enforcing the laws of another state, this [c]ourt is disinclined to overrule the positive law of this forum to give foreign law effect especially when it would contravene the fixed policy of the law of this state"); 6 C. Wright et al., supra, § 1417, p. 161 (questioning the applicability of rule 13 (a) to states that do not have compulsory counterclaim rule: "The rule itself and the [a]dvisory [c]ommittee [n]ote accompanying it are silent on whether [r]ule 13 (a) was intended to be a rule of administration for the federal courts or was expected to have wider application. Indeed, it is doubtful whether the rulemakers are given the power by the Rules Enabling Act [28 U.S.C. § 2072 (2018)] to decide that question or to extend the effect of the federal rules to the state courts." (Footnote omitted.)).

Rooted in principles of res judicata, estoppel, and waiver; see *Tyler* v. *DH Capital Management, Inc.*, 736 F.3d 455, 460 (6th Cir. 2013); the purpose of rule 13 (a) of the Federal Rules of Civil Procedure is "to prevent multiplicity of actions and to achieve resolution in a single lawsuit of all disputes arising out of common matters." *Southern Construction Co.* v. *Pickard*, 371 U.S. 57, 60, 83 S. Ct. 108, 9 L. Ed. 2d 31 (1962); see also *Super Natural Distributors, Inc.* v. *MuscleTech Research & Development*, 140 F. Supp. 2d 970, 978–79 (E.D. Wis. 2001) ("[r]ule 13 (a) was designed to balance the interest of the counterclaimant in prosecuting the counterclaim in a forum of its own choosing against the [court's] interest in conserving judicial resources" (internal quotation marks omitted)). In light of the equitable principles underlying the rule, it is apparent that a court need not apply it when to do so would work an injustice; see *Carnation Co.* v. *T.U. Parks Construction Co.*, 816 F.2d 1099, 1103 (6th Cir. 1987) ("the waiver or estoppel theory [underlying rule 13 (a)] allows more discretion not to hold [that a] claim is barred [when] to do so is manifestly unjust"); such as when a decision on the merits was not rendered in the prior action because it was dismissed on grounds of res judicata or for failure to state a claim on which relief could be granted. See, e.g., *Tyler* v. *DH Capital Management, Inc.*, supra, 460 (plaintiff's failure to plead compulsory counterclaims in prior action was not bar to later action because "the principles of res judicata . . . apply [only] to adjudications on the merits"); id., 459 ("a party is not required to assert a counterclaim [when] it successfully files a [preanswer] motion to dismiss"); *Martino* v. *McDonald's System, Inc.*, 598 F.2d 1079, 1083 (7th Cir.) ("[t]he principle of res judicata at issue . . . treats a judgment *on the merits* as an absolute bar to

relitigation between the parties and those in privity with them" (emphasis added)), cert. denied, 444 U.S. 966, 100 S. Ct. 455, 62 L. Ed. 2d 379 (1979); see also *National Union Fire Ins. Co. of Pittsburgh* v. *Jett*, 118 F.R.D. 336, 338 (S.D.N.Y. 1988) ("Rule 13 [(a)] requires that a compulsory counterclaim be raised only when it is related to the 'subject matter of the opposing party's claim.' Dismissal of an action is a judicial determination that the plaintiff has no claim. Therefore, compulsory counterclaims that were not raised prior to dismissal are not barred in future proceedings."); *Horn & Hardart Co.* v. *National Railroad Passenger Corp.*, 659 F. Supp. 1258, 1264 (D.D.C. 1987) ("In this case, the policy driving rule 13 (a) must give way to a more important concern. When [the defendant] filed a rule 12 (b) motion in response to [the plaintiff's] complaint in [the prior action], [the defendant] was in effect arguing that [the plaintiff] had not proffered a valid claim. In holding for [the defendant], the [c]ourt confirmed the [defendant's] contention. The so-called claim did not require a pleading in response. . . . In such a case, the party opposing an invalid claim should not be required to fully litigate any claims of its own . . . ." (Citation omitted.)), aff'd, 843 F.2d 546 (D.C. Cir.), cert. denied, 488 U.S. 849, 109 S. Ct. 129, 102 L. Ed. 2d 102 (1988); 6 C. Wright et al., supra, § 1417, pp. 154–55 ("courts have avoided the application of [claim preclusion] rules when no decision on the merits was rendered in the first action").

Accordingly, even if Kalra had been a party to the federal action, rule 13 (a) of the Federal Rules of Civil Procedure would not bar Chugh's claims in the present case in light of the District Court's determination that TAL was collaterally estopped from pursuing the claims in the federal action. As we indicated, after the Cayman court issued its ruling in the winding up proceeding, the District Court granted the Chugh defendants' motion for summary judgment, stating that "Asia Pacific . . . attempted to defend against the winding up of TAL on the ground of unclean hands, arguing that [ARC Capital and Haida] . . . were barred from invoking the court's equitable jurisdiction because of Chugh's breaches of fiduciary duty, which were attributable to [them]. As evidence of Chugh's misconduct, Asia Pacific put on evidence relating to each of TAL's claims in this litigation." *Trikona Advisers, Ltd.* v. *Chugh*, United States District Court, Docket No. 3:11-cv-2015 (SRU) (D. Conn. June 5, 2015), aff'd, 846 F.3d 22 (2d Cir. 2017). The court further stated: "The unclean hands defense was a dispositive issue in the Cayman [court] proceeding, and the bulk of the winding up proceeding was devoted to the parties' attempts to prove or disprove Chugh's alleged misconduct." Id. "Having chosen to fight [through Asia Pacific] the winding up petition by advancing as a defense all of the substantive claims raised in this litigation, [TAL] cannot now avoid the consequences of its actions. Even under the . . . restrictive approach

[of the Restatement (Second) of Judgments], [its] claims are barred by the doctrine of issue preclusion." Id.

It would be anomalous, to say the least, were we to conclude that Chugh's claims in the present case are barred by principles of res judicata, estoppel, or waiver due to his failure to assert them as counterclaims in a case that itself was barred by those principles. We do not read rule 13 (a) of the Federal Rules of Civil Procedure or the case law interpreting it as requiring such a result, and, therefore, we will not impose it.[12] As the United States Court of Appeals for the Fifth Circuit stated in a similar context, "[i]f one hauled into [c]ourt as a defendant has a claim but the adversary plaintiff has not, the nominal defendant ought to be allowed to name the time and place to assert it. . . . It is one thing to concentrate related litigation once it is properly precipitated. It is quite another thing for the [Federal Rules of Civil Procedure] to compel the institution of litigation." *Lawhorn* v. *Atlantic Refining Co.*, 299 F.2d 353, 357 (5th Cir. 1962). In light of the foregoing, we reject Kalra's claim that rule 13 (a) (1) bars Chugh's claims in the present case on the ground that all of them were compulsory counterclaims in the federal action.[13]

## II

We next address Kalra's claim that Chugh's breach of partnership agreement and breach of fiduciary duty claims fail as a matter of law under *Karanian* v. *Maulucci*, supra, 185 Conn. 320, in light of language in that case that, "[i]f [partners] adopt the corporate form, with the corporate shield extended over them to protect them against personal liability, they cease to be partners and have only the rights, duties and obligations of stockholders. They cannot be partners inter sese and a corporation as to the rest of the world." (Internal quotation marks omitted.) Id., 324, quoting *Jackson* v. *Hooper*, 76 N.J. Eq. 592, 599, 75 A. 568 (1910). Kalra argues that "*Karanian* is fatal to Chugh's claim of an enduring partnership agreement that survived corporate formation . . . . Any oral partnership created over lunch in 2004 . . . definitively ceased to exist when Chugh and Kalra incorporated TAL, Trinity, and the subsidiary corporate entities in 2006." Chugh responds that *Karanian* is irrelevant to the outcome of this case for the simple reason that "there is no evidence . . . that Chugh and Kalra intended to adopt the corporate form and [to] replace their partnership with a corporation, as opposed to simply choosing to own corporations within the Trikona Group partnership." (Internal quotation marks omitted.) Chugh further contends that, under Connecticut law, a partnership can own any type of assets, including corporations, and that the jury reasonably found, on the basis of the evidence presented, that Chugh and Kalra's partnership consisted of owning and running a series of companies comprising the Trikona

Group, but the partnership was not itself subsumed within any one of those companies. We agree with Chugh.

General Statutes § 34-301 (12) defines "partnership" as "an association of two or more persons to carry on as co-owners a business for profit . . . ." Section 34-301 (13) defines "partnership agreement" as "[an] agreement, whether written, oral or implied, among the partners concerning the partnership, including amendments to the partnership agreement." This court previously has recognized that "general and limited partners are bound in a fiduciary relationship and, as such, must act as trustees and represent the interests of each other." (Internal quotation marks omitted.) *Hi-Ho Tower, Inc.* v. *Com-Tronics, Inc.*, 255 Conn. 20, 39, 761 A.2d 1268 (2000); see also *Iacurci* v. *Sax*, 313 Conn. 786, 800, 99 A.3d 1145 (2014) (partners "are per se fiduciaries"). Whether Chugh and Kalra entered into an oral partnership agreement in 2004 was a question of fact for the jury. See, e.g., *Bender* v. *Bender*, 292 Conn. 696, 728, 975 A.2d 636 (2009) ("[i]t is well settled that the existence of a contract is a question of fact"). Whether, under *Karanian*, that agreement ended as a matter of law in 2006 is a question of law subject to this court's plenary review. See, e.g., *Fish* v. *Fish*, 285 Conn. 24, 37, 939 A.2d 1040 (2008) (trial court's determination of proper legal standard is question of law subject to plenary review).

We agree with Chugh that *Karanian* is not controlling of his breach of partnership agreement and breach of fiduciary duty claims. To understand why, we must revisit the facts of that case. In *Karanian*, the trial court found that the plaintiff's father, Charles Karanian, and the defendant, Richard Maulucci, Sr., "agreed (1) to enter into a joint enterprise to open and operate a roller-skating rink in Wallingford . . . (2) to a 50 percent share for each of them in the business; (3) to change eventually the joint enterprise into a corporation and (4) to contribute [$20,000] each to the business as a capital investment. Karanian made his contribution and named the plaintiff as the holder of the beneficial interest of his investment. Maulucci . . . never fulfilled his promise to make a similar contribution of cash.

"In September, 1977, Maulucci . . . filed with the [O]ffice of the [S]ecretary of the [S]tate a certificate of incorporation, an appointment of statutory agent for service, and an organizational and first annual report.

\* \* \*

"In the latter part of March, 1978, Maulucci . . . barred Karanian from the business premises and took over complete control of the business operation. The dispute between the parties had escalated to the point where it was no longer feasible for them to operate the business as equal owners. As a result, the plaintiff

commenced [an] action, claiming an accounting, damages, the appointment of a receiver and other relief.

"On the basis of these facts, [the trial court concluded] that [a]s a consequence of the neglect to implement the agreement to operate as a corporation, the corporate entity may be a shield for Karanian and Maulucci against the outside world so as to protect them from personal liability for corporate activities, but as between themselves, they, in essence and in reality, have only a partnership, with each having a [50] percent interest therein." (Emphasis omitted; internal quotation marks omitted.) *Karanian* v. *Maulucci*, supra, 185 Conn. 322–23.

On appeal, both parties claimed that the trial court erred in concluding that, as between themselves, Karanian and Maulucci were partners, despite having incorporated their business by filing the necessary paperwork with the Secretary of the State. See id., 323. This court agreed and, in doing so, quoted *Jackson* v. *Hooper*, supra, 76 N.J. Eq. 599, for the proposition that, when partners in a business venture " 'adopt the corporate form, with the corporate shield extended over them to protect them against personal liability, they cease to be partners and have only the rights, duties and obligations of stockholders. They cannot be partners inter sese and a corporation as to the rest of the world.' " *Karanian* v. *Maulucci*, supra, 185 Conn. 324.

Unlike in the present case, however, the trier of fact in *Karanian* found not only that the parties intended to reorganize their joint venture into a corporation but that they did, in fact, complete such a reorganization. See id., 322. On appeal, the sole issue before this court was whether, in light of these findings, the trial court properly could find, over the parties' objections, that their business was *both* "a corporation and a partnership at the same time." Id., 324. On the basis of the record and the undisputed facts, which included a certified copy of the certificate of incorporation endorsed by the Secretary of the State, this court concluded that "the roller-skating business conducted by [the parties] operated as a corporation and not as a partnership." Id., 324–25. Because the parties in *Karanian* did not claim that their partnership survived the incorporation of the roller-skating rink—indeed, both sides maintained that there was no partnership—this court had no reason to consider whether a partnership could survive incorporation and, if so, under what circumstances.

Courts that have considered this issue, however, as Kalra acknowledges in his appellate brief, consistently have held that a partnership can operate through a corporation, so long as it is the intent of the partners to do so and the rights of third parties, such as creditors or shareholders, are not adversely affected. As the Second Circuit Court of Appeals has explained: "When the parties intend to merge their entire joint venture agree-

ment, including their rights inter sese and the conduct of the business enterprise planned or conducted under the agreement, into the form of a corporation, they are bound by the result and are relegated to their rights as corporate stockholders. . . .

"[However] when the parties to a joint venture agreement, in forming a corporation to carry out one or more of its objectives, intend to reserve certain rights inter sese under their agreement, which do not interfere with or restrict the management of the affairs of the corporation, its exercise of corporate powers, or the rights of third parties doing business with it, these rights being extrinsic to the corporate entity and its operations, such joint venture agreement may be enforced." (Citations omitted.) *Sagamore Corp.* v. *Diamond West Energy Corp.*, 806 F.2d 373, 378 (2d Cir. 1986); see id., 378–79 (citing cases); see also *Arditi* v. *Dubitzky*, 354 F.2d 483, 486–87 (2d Cir. 1965) ("There is little logical reason why individuals cannot be partners inter sese and a corporation as to the rest of the world, so long as the rights of the third parties such as creditors are not involved. . . . The courts of New York and New Jersey have come to recognize this . . . at least to the extent of permitting suit [on] joint venture obligations if it is apparent that the intention of the parties was that the corporation should be only a means of carrying out the joint venture . . . or a way of organizing different branches of a wide-reaching joint enterprise . . . ." (Citations omitted; internal quotation marks omitted.)); *Paretti* v. *Cavalier Label Co.*, 702 F. Supp. 81, 83–84 (S.D.N.Y. 1988) ("[i]n New York, entrepreneurs may consider themselves to be partners even though their business is organized as a corporation, so long as the partnership agreement does not interfere with the rights of third parties such as creditors"); *Eng* v. *Brown*, 21 Cal. App. 5th 675, 696, 230 Cal. Rptr. 3d 771 (2018) ("Partners may, by agreement, continue their relations as copartners in conjunction with their relationship as stockholders of a corporation, and the law would take cognizance of such dual relationship and deal with the parties in the light of their [agreements between themselves], independently of their incorporation . . . . [C]ourts will enforce preincorporation agreements among partners or joint venturers who have incorporated in order to carry out the agreement between or among the partners or joint venturers." (Citations omitted; internal quotation marks omitted.)), review denied, California Supreme Court, Docket No. S248552 (July 11, 2018); *Gruber* v. *Wilner*, 213 Ga. App. 31, 34, 443 S.E.2d 673 (1994) ("[i]t is generally held that a joint venture agreement continues in effect following the formation of a corporation created to implement it if the intention of the parties to this effect is clear" (emphasis omitted; internal quotation marks omitted)); *Koestner* v. *Wease & Koestner Jewelers, Inc.*, 63 Ill. App. 3d 1047, 1050, 381 N.E.2d 11 (1978) ("[a]n emphasis on substance

over form has led numerous courts to conclude that . . . [t]here is little logical reason why individuals cannot be partners inter sese and a corporation as to the rest of the world, so long as the rights of third parties such as creditors are not involved" (internal quotation marks omitted)); *Blank* v. *Blank*, 222 App. Div. 2d 851, 853, 634 N.Y.S.2d 886 (1995) ("[l]acking a compelling reason to preclude individuals from acting as partners between themselves and as a corporation to the rest of the world . . . courts have sanctioned such an arrangement as long as the rights of third parties, like creditors, are not involved and the parties' rights under the partnership agreement are not in conflict with the corporation's functioning"); *Schuster* v. *Largman*, 308 Pa. 520, 531, 162 A. 305 (1932) (principle that business cannot be partnership and corporation at same time "does not mean that a partnership may not organize corporations to handle a portion of its business and own all of the stock in them"); *Jolin* v. *Oster*, 44 Wis. 2d 623, 630, 172 N.W.2d 12 (1969) (citing cases and noting that "a preincorporation joint adventure or partnership agreement providing for the use of a corporation as a medium for the venture survives the corporation").

In the present case, there is simply no evidence that Chugh and Kalra ever intended to adopt the corporate form in place of their partnership. To the contrary, as the trial court stated in denying Kalra's motion to set aside the verdict, the partnership, as presented to the jury, was an "overarching entity" comprised of numerous companies owned by Chugh, Kalra, and their respective families, acting in concert to further the remunerative goals of the partnership. Kalra cites no authority, and we are aware of none, holding that a partnership cannot operate in this manner.[14] Nor did Kalra argue at trial that a partnership cannot operate in this manner or take exception to the trial court's instruction to the jury that it could.[15] His sole contention, rather, was that the evidence did not support a finding that he and Chugh were ever partners.[16] The jury evidently disagreed.

Chugh's and Kalra's testimony in this regard could not have been more diametrically opposed. Whereas Chugh testified that the two men were introduced in 2002, that they were eating lunch with one another nearly every day by 2004, and that they decided to form a partnership to pursue investment opportunities in India at the beginning of 2004,[17] Kalra testified that he did not know Chugh in 2004, that the two men "never ever discussed a partnership agreement," and that it was "completely unthinkable" that he would have entered into such an agreement with Chugh, in 2004 or any other time. During cross-examination, however, Kalra acknowledged that he repeatedly referred to Chugh as his "partner" during the Cayman winding up proceeding in 2013—and elsewhere over the years— and that he testified during that proceeding that he "did

not want [a] winding down [of TAL]," but, rather, he just "did not want to be partners with . . . Chugh anymore." He also acknowledged that he and Chugh "associate[d] for a profit in business" under the umbrella of the Trikona Group and that "a substantial benefit of working in the Trikona Group was to make . . . money for [themselves and their respective families]." Although Chugh's evidence of a partnership was not overwhelming, we agree with the trial court that it was sufficient to support the jury's finding of an oral agreement between Chugh and Kalra to carry on, as co-owners, a business for profit—to wit, the Trikona Group—and that the two men carried on that business from 2004 until at least 2013.

III

We turn, therefore, to Kalra's claim that the trial court abused its discretion in admitting the testimony of Chugh's expert witness on damages, Savoldelli, because there was insufficient evidence to support his testimony. Chugh responds that the trial court correctly determined that any error in the admission of Savoldelli's testimony was harmless because the jury obviously did not "fully accept" his testimony and the trial court incorrectly instructed the jury that Chugh was required to prove damages relative to the libel per se claim when, in fact, he was not required to prove damages. We agree with Kalra.

The following additional facts and procedural history are relevant to our resolution of this claim. Prior to trial, Kalra filed a motion in limine to preclude Savoldelli's testimony on the ground that it had no basis in scientific fact but was wholly speculative and conjectural. Kalra argued that Savoldelli had testified, during his deposition, that his damages estimate assumed that Chugh could have raised $250 million for his investment fund, Peak XV, but for Kalra's defamatory statements, because "Chugh was one of two partners at [Trinity] and that fund had raised on the order of $500 million . . . ." Savoldelli stated that "[he] conservatively just assumed that each of the two [partners]" had raised one half of Trinity's funds and, therefore, that Chugh would have been able to raise that same amount for his own investment fund. In his motion in limine, Kalra argued that Savoldelli's expert testimony was inadmissible under *State* v. *Porter*, 241 Conn. 57, 698 A.2d 739 (1997), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998), which requires that "proposed scientific testimony . . . be demonstrably relevant to the facts of the particular case in which it is offered, and not simply . . . valid in the abstract." Id., 65. Kalra argued that, under this standard, Savodelli's testimony must be excluded because it was undisputed that Chugh and Peak XV failed to raise any funds between 2009 and 2015.

In its ruling on the motion in limine, the trial court

noted that it had "heard the parties in chambers" with respect to the issues raised in the motion and that it had decided to "allow [their] experts to testify about the market conditions during the time in question and the qualities or conditions necessary to raise funds . . . ." The court further stated that it would "allow the experts to render a damages opinion or analysis that focuses on the amount that the market would yield assuming a particular base amount, provided there is evidence to support that assumption."

At trial, Savoldelli testified that the 2013 press release, which accused Chugh of bribery, would have been "fatal" to Chugh's two investment funds. He further testified that his damages estimate "assum[ed]" that the two funds "had 250 million [dollars] under management as of 2012" and that, by applying a "cash flow analysis begin[ning] effectively midway through the year in 2012," he was able to determine that the companies would have earned $20.2 to $27.7 million between 2012 and 2026, but for the 2013 press release. At the conclusion of the evidence, the trial court instructed the jury in relevant part: "[If] you reject the defendant's affirmative defense [with respect to the libel claim], then you should consider what damages, if any, to award the plaintiff for libel. Ordinarily, the plaintiff would have to prove that a libelous statement caused harm to his reputation. However, certain written defamatory statements are so harmful in and of themselves that the plaintiff is entitled to recover at least nominal damages for injury to reputation without proving that the publication actually caused harm to the plaintiff. I have determined that the statement in question falls into this category; therefore, if you find that the plaintiff has proven the first two elements of libel and that the defendant has not proven his affirmative defense, then you must award the plaintiff at least $1 in nominal damages.

"Nominal damages should be awarded if you find that the defamatory material is of an insignificant character, or because you find that the plaintiff ha[s] bad character, so that no substantial harm has been done to the plaintiff's reputation, or because there is no proof that serious harm has been done to the plaintiff's reputation.

"It is up to you to decide whether to award . . . Chugh only nominal damages or, instead, to award him compensatory damages for any proven injury to his reputation and economic loss; thus, on this count, if you reach the issue of damages in accordance with these instructions, and if [Chugh] proves that he lost profits as a result of the harm that the statement in question did to his reputation, you should award compensatory damages instead of nominal damages."

During deliberations, the jury sent a note to the judge inquiring whether there was "a cap" on what it could award in nominal damages. In response, the trial court

instructed the jury: "No, but here is some additional guidance on the meaning of nominal damages. Nominal damages are a trivial sum of money awarded to a litigant who has established a cause of action but has not established that he is entitled to compensatory damages."

Following the jury's verdict, Kalra filed a motion to set aside the verdict as to the libel claim on a variety of grounds, but primarily because there was no evidence to support Savoldelli's testimony that Chugh had lost more than $20 million as a result of the 2013 press release. Kalra argued that the trial court should have recognized that Savoldelli's testimony was irrelevant and, therefore, inadmissible under *Porter* given that his damages estimate assumed that Chugh's investment funds had $250 million under management in 2012 when, in fact, according to Chugh's own testimony, they had no money under management in 2012. The trial court denied the motion, reasoning that any error relating to Savoldelli's testimony was harmless. Specifically, the court reasoned: "[Kalra's] argument, which he presented to the jury, has strong logical appeal. Unfortunately, [Chugh's] brief does not respond to it. . . . The court is left with little guidance as to how to handle this newly raised issue.

"The court concludes that any error involving the admission of Savoldelli's testimony was harmless. To begin with, the jury did not fully accept Savoldelli's testimony of damages exceeding $20 million. Instead, the jury awarded $4 million in lost profits on the libel [claim] . . . .

"Further, [Chugh], under our law, was not required to prove actual damages or lost profits in a libel per se case. The court charged that, because the [2013] press release was libelous per se, the jury should award [Chugh] at least nominal damages and then decide to award him compensatory damages 'if [he] proves that he lost profits as a result of the harm that the statement in question did to his reputation . . . .' In contrast, [Chugh] requested the following charge: 'If you find that . . . Kalra's statements were libelous per se, you must award . . . Chugh general damages for injury to reputation regardless of whether he demonstrated special damages. In determining the amount of general damages to award for the injury to [Chugh's] reputation, you should consider what reputation [Chugh] had in the community when the writing was made and all of the circumstances surrounding the making of the writing. You may also compensate [Chugh] for damages that he will likely incur in the future. . . . General and special damages together comprise what are called compensatory damages, or damages that compensate . . . Chugh for his loss.' . . . [Chugh's] request to charge . . . was a correct statement of the law. . . . Although [Chugh] does not raise the jury charge issue in his own postverdict briefs, the fact remains that the

charge as given was more favorable to [Kalra] than that to which he was entitled. . . . Therefore, [Kalra] cannot prevail on his challenge to the damages award on libel." (Citations omitted; footnotes omitted.)

It is well established that, "[b]efore a party is entitled to a new trial because of an erroneous evidentiary ruling, he or she has the burden of demonstrating that the error was harmful. . . . In other words, an evidentiary ruling will result in a new trial only if the ruling was both wrong and harmful." (Citation omitted; internal quotation marks omitted.) *Klein* v. *Norwalk Hospital*, 299 Conn. 241, 254, 9 A.3d 364 (2010). The same standard applies to claims of instructional error. That is, "not every improper jury instruction requires a new trial because not every improper instruction is harmful. [W]e have often stated that before a party is entitled to a new trial . . . he or she has the burden of demonstrating the error was harmful. . . . An instructional impropriety is harmful if it is likely that it affected the verdict." (Internal quotation marks omitted.) *Burke* v. *Mesniaeff*, 334 Conn. 100, 121, 220 A.3d 777 (2019).

It is true, as the trial court stated, that Chugh was not required to prove lost profits to recover compensatory damages. In a libel per se case, the jury may award the plaintiff general damages in an amount it deems sufficient to compensate him for the injury to his reputation and the mental suffering caused by the defamatory statement. See, e.g., *Battista* v. *United Illuminating Co.*, 10 Conn. App. 486, 492, 523 A.2d 1356 ("When the defamatory words are actionable per se, the law conclusively presumes the existence of injury to the plaintiff's reputation. He is required neither to plead nor to prove it. . . . The individual plaintiff is entitled to recover, as general damages, for the injury to his reputation and for the humiliation and mental suffering [that] the libel caused him." (Citation omitted; internal quotation marks omitted.)), cert. denied, 204 Conn. 802, 525 A.2d 1352 (1987), and cert. denied, 204 Conn. 803, 525 A.2d 1352 (1987); see also *Gleason* v. *Smolinski*, 319 Conn. 394, 435, 125 A.3d 920 (2015) ("there is no dispute that the subject matter of these statements is defamatory per se because they charge crimes punishable by imprisonment and, therefore, the plaintiff is relieved from the burden of pleading and proving damages to her reputation"); *Proto* v. *Bridgeport Herald Corp.*, 136 Conn. 557, 572–73, 72 A.2d 820 (1950) (upholding general damages award of $5150 in libel per se case and concluding that, "[i]n view of the seriousness of the calumny published by the defendant and of the widespread publication given to it throughout the community in which the plaintiff had been brought up, had attended school and had engaged in business, we cannot say that the amount is excessive"); *Miles* v. *Perry*, 11 Conn. App. 584, 587, 594, 529 A.2d 199 (1987) (upholding general damages award of $25,000 in libel per se case).

In order to recover *lost profits*, however, "[a] plaintiff must present sufficiently accurate and complete evidence for the trier of fact to be able to estimate those profits with reasonable certainty." *Beverly Hills Concepts, Inc.* v. *Schatz & Schatz, Ribicoff & Kotkin*, 247 Conn. 48, 70, 717 A.2d 724 (1998); see also *Simone Corp.* v. *Connecticut Light & Power Co.*, 187 Conn. 487, 495, 446 A.2d 1071 (1982) ("[d]amages for losses of profits are recoverable only to the extent that the evidence affords a sufficient basis for estimating their amount in money with reasonable certainty" (internal quotation marks omitted)). This applies equally to a case of libel per se. See, e.g., *DeVito* v. *Schwartz*, 66 Conn. App. 228, 235, 784 A.2d 376 (2001) ("The . . . plaintiff is entitled to recover, as general damages, for the injury to his reputation and for the humiliation and mental suffering which the [defamation] caused him. . . . To recover special damages, however, the plaintiff must prove that he suffered economic loss that was legally caused by the defendant's defamatory statements, even [when] the defamation is per se. See 3 Restatement (Second), Torts § 622 (1977). General and special damages together comprise compensatory damages. See 4 Restatement (Second), Torts, § 904 (1979)." (Citation omitted; internal quotation marks omitted.)).

In the present case, it is undisputed that Savoldelli's testimony that Chugh sustained lost profits in excess of $20 million had no basis in fact. Because the jury was instructed to award special damages *only* if it found that Chugh had proven lost profits, and because there was no other evidence to support the lost profits award, the damages award cannot stand.

In reaching a contrary conclusion, the trial court cited *State* v. *Gradzik*, 193 Conn. 35, 475 A.2d 269 (1984), for the proposition that any evidentiary insufficiency occasioned by that court's instructional error was harmless. *Gradzik*, however, does not support the trial court's ruling. In that case, the defendant was convicted of burglary in the third degree. Id., 36. At the close of evidence, the trial court instructed the jury that it could find the defendant guilty only if it found that "the defendant had unlawfully entered the building by entering the cellar." Id., 37–38. On appeal, the defendant claimed "that the court erred in denying his motion [for a judgment of acquittal] because there was insufficient evidence from which the jury could conclude that he had entered the cellar. The state counter[ed] that the motion was properly denied because there was sufficient evidence that the defendant had entered the cellar and, in the alternative, that the defendant had unlawfully entered the hatchway which is part of the building. Because [this court] agree[d] that the defendant's presence in the hatchway constituted an unlawful entry into the building, we [concluded that we did not need to] decide whether there was sufficient evidence that the

defendant had entered the cellar" because it was "beyond cavil that the hatchway is part of the building in question" and the defendant had "concede[d] that he was in the hatchway . . . ." Id., 38.

Thus, we concluded in *Gradzik* that, even if the evidence was insufficient to support a finding that the defendant had entered the cellar, the error was harmless because the evidence was undeniably sufficient to support a conviction under the correct standard. Id., 38–39. In the present case, however, there is simply no evidence that Chugh sustained lost profits in the amount of $4 million—or in any other amount—as a result of the 2013 press release. Nor are we able to conclude that the jury would have awarded him $4 million in general damages but for the instructional impropriety.[18] A properly instructed jury might have awarded him more or less; we simply have no way of knowing. In light of the foregoing, we cannot conclude that the instructional error in this case was harmless. Accordingly, the verdict must be set aside as to the libel claim, and the case remanded for a new trial on that claim.[19] In addition, we agree with Kalra that a new hearing on punitive damages is also required because the record reveals that a component of the punitive damages award was a "success fee" for Chugh's attorney in the amount of 25 percent of the total compensatory damages award, which included the $4 million libel award.

The judgment is reversed with respect to the libel per se claim and the punitive damages award, and the case is remanded for a new trial on that claim and for a hearing in damages consistent with this opinion; the judgment is affirmed in all other respects.

In this opinion the other justices concurred.

[1] Two companies controlled by Chugh, Peak XV Capital, LLC (Peak XV), and ARC Capital, LLC (ARC Capital), were also added as plaintiffs in this action. The trial court granted the defendants' motion to dismiss ARC Capital from the case for lack of standing and to dismiss Peak XV from the case with respect to every claim except the libel claim. For the sake of clarity, we refer in this opinion to Chugh, Peak XV, and ARC Capital by name.

[2] Trikona Advisers Limited (TAL) was also named as a defendant in this case. For the sake of clarity, we refer in this opinion to Kalra and TAL collectively as the defendants and individually by name when appropriate.

[3] The trial court later ordered a remittitur in the amount of $451,171.24.

[4] Kalra appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-2.

[5] Rule 13 (a) of the Federal Rules of Civil Procedure provides in relevant part: "(1) *In General*. A pleading must state as a counterclaim any claim that—at the time of its service—the pleader has against an opposing party if the claim:

"(A) arises out of the transaction or occurrence that is the subject matter of the opposing party's claim; and

"(B) does not require adding another party over whom the court cannot acquire jurisdiction. . . ."

[6] In *Trikona Advisers Ltd.* v. *Haida Investments Ltd.*, 318 Conn. 476, 479 n.5, 122 A.3d 242 (2015), this court observed that "[t]hese parties have filed several actions in multiple domestic and international courts. For example, other than the present action, the parties have filed actions in the United States District Court for the District of Connecticut, the New York Supreme Court, the Grand Court of the Cayman Islands, India, and Mauritius."

[7] Evidence adduced at trial reveals that, as of September 27, 2012, twelve

companies comprised what the parties referred to as the "Trikona Group": TAL in the Cayman Islands, Trikona Capital Advisers, LLC, in Delaware, Trinity Capital Limited, TSF Advisers Mauritius Limited, Trikona Advisers Mauritius Limited, Trikona Capital Limited in the Cayman Islands, Trikona Capital Advisers Limited in the United Kingdom, Sankalp Buildwell PVT Limited in India, Trikona Capital Mauritius Limited, Trikona Investments Limited in Mauritius, Trikona Asset Holdings Limited in Mauritius, and TCK Advisers PVT Limited in India.

[8] A copy of the Cayman court's memorandum of decision was entered into evidence at the trial in the present case.

[9] ARC Capital brought an action in the trial court against Asia Pacific and Kalra, seeking to domesticate and enforce the Cayman court's costs order. The trial court later consolidated that case and the present case for trial. "In count three of the domestication complaint, [ARC Capital] sought to pierce the corporate veil of Asia Pacific and to hold Kalra liable for the full amount of the costs judgment." The jury found in favor of ARC Capital on count three, but the trial court granted Kalra's motion to set aside the verdict on the ground that the evidence was insufficient to support the jury's finding that Kalra had used his control of Asia Pacific to commit a fraud or wrong that proximately caused ARC Capital's inability to collect what Asia Pacific owed it under the costs order. ARC Capital did not appeal from that ruling.

[10] The operative complaint alleged three additional claims that were dismissed or withdrawn before trial: breach of an ancillary settlement agreement, breach of an implied contract to form a joint venture, and breach of the implied covenant of good faith and fair dealing.

[11] See footnote 1 of this opinion.

[12] Kalra contends, nonetheless, that, because the Chugh defendants filed an answer in the federal action several months before filing their motion for summary judgment, Chugh's claims in the present case were compulsory counterclaims in that action. Kalra argues that rule 13 (a) of the Federal Rules of Civil Procedure requires a compulsory counterclaim to be filed at the time of the defendant's responsive "pleading," regardless of the final disposition of the case, and that only in the absence of such a pleading is the defendant relieved of the obligation to file such a counterclaim. See, e.g., *Bluegrass Hosiery, Inc.* v. *Speizman Industries, Inc.*, 214 F.3d 770, 772 (6th Cir. 2000) ("Rule 13 (a) . . . only requires a compulsory counterclaim if the party who desires to assert a claim has served a pleading. . . . In other words, [r]ule 13 (a) does not apply unless there has been some form of pleading." (Citation omitted.)) Under Kalra's reading of rule 13 (a), therefore, if the Chugh defendants had moved for summary judgment prior to filing their answer, Chugh's claims in the present case would not be barred because a motion for summary judgment is not a pleading under the Federal Rules of Civil Procedure. See *National Union Fire Ins. Co. of Pittsburgh* v. *Jett*, supra, 118 F.R.D. 337–38 ("[The plaintiff] never filed a pleading in the [prior] action. Its motion to dismiss or for summary judgment was not a pleading as defined in [rule 7 of the Federal Rules of Civil Procedure]. Therefore, its claims were not required to be raised in the [prior] action.") For the reasons previously set forth, we conclude that Kalra's interpretation of rule 13 (a) is not only inconsistent with the equitable principles underlying that rule but is in no way compelled by the case law interpreting it. Indeed, if Chugh *had* asserted his claims as counterclaims in the federal action, there is no reason to think that the District Court would not have allowed him to withdraw them without prejudice once that court determined that all of TAL's claims were barred by collateral estoppel.

[13] We note, moreover, that it is not at all clear that rule 13 (a) of the Rules of Civil Procedure has any applicability to a state court action that was commenced while the federal court action was still pending, which occurred here. "Although it is well established [in the federal courts] that a party is barred from suing on a claim that should have been pleaded as a compulsory counterclaim in a prior action, one closely related question remains unsettled. What would prevent a defendant who does not want to assert a claim as a compulsory counterclaim in the opposing party's suit from bringing an independent action on that claim while the first action still is pending? Neither claim preclusion nor waiver or estoppel [is an] appropriate [theory] for barring a second suit of this type. Preclusion becomes operative only upon the termination of an action and therefore can have no bearing on the second action in the situation under discussion since the first suit still is pending." (Footnote omitted.) 6 C. Wright et al., supra, § 1418, p. 164 "Clearly the language of [r]ule 13 (a) cannot be construed as empowering the federal court to restrain [state court] proceedings. Thus, if a party asserts

a claim in a state court that should be a compulsory counterclaim in an already pending federal action, the federal court cannot enjoin the prosecution of the state proceeding. In this situation the general objective underlying [r]ule 13 (a) of avoiding multiple suits is outweighed by the express statutory policy prohibiting federal interference with the functioning of state judicial systems. The result is that in the absence of voluntary restraint by one of the courts, both the federal and the state actions will proceed toward judgment and the first to reach that point will serve as the basis for asserting a defense of claim or issue preclusion in the action that still is being adjudicated." (Footnote omitted.) Id., pp. 174–75.

[14] Although acknowledging the substantial body of law holding that the intent of the parties controls whether a partnership survives incorporation of the partnership business, Kalra argues that there are numerous courts, such as the New York Court of Appeals, that have "never abrogated" the so-called "categorical rule" set forth in *Jackson* v. *Hooper*, supra, 76 N.J. Eq. 599, the 1910 New Jersey case cited in *Karanian*, that a partnership cannot be both a partnership and a corporation at the same time. Kalra cites just one case, *D'Orazio* v. *Mainetti*, 24 App. Div. 3d 915, 805 N.Y.S.2d 455 (2005), as an example of a court that "enforce[ed] the categorical . . . rule and recognize[d] no exceptions [to it]." We disagree that the court in *D'Orazio* applied a different standard from any of the other New York cases cited in this opinion. Although the court in *D'Orazio* recognized the general rule that, "[w]hen parties adopt the corporate form, with the corporate shield extended over them to protect them against personal liability, they cease to be partners and have only the rights, duties and obligations of stockholders"; (internal quotation marks omitted) id., 916; the court "agree[d] that the record as a whole contain[ed] sufficient proof to raise a question of fact as to whether the firm operated as a partnership despite its legal incorporation, [but it did] not find such proof sufficient to establish, as a matter of law, that [the parties] indeed continued to operate as a de facto partnership following the firm's incorporation . . . ." Id., 917. Thus, the court reversed the trial court's summary judgment and remanded the case for a trial to determine the "factual issue" of whether the parties intended for their partnership to survive the incorporation of their business. Id.

[15] The trial court instructed the jury that, "[a]lthough one company cannot be both a corporation and a partnership, it is possible that there can be a partnership separate and apart from a corporate entity or group of corporate entities. . . . Ultimately, the existence of a partnership is a question of the intention of the parties to be determined by you from all the facts and circumstances."

[16] During closing arguments, Kalra's counsel argued: "As further evidence [that the partnership] didn't exist, [Chugh] testified that he never registered the partnership here in Connecticut where he and . . . Kalra lived, that, when he filed tax returns, he never disclosed the partnership to the Internal Revenue Service. Remember, partnerships are about profits, and profits are taxable. He never disclosed the partnership to any department of the [United States] Treasury. He never disclosed the partnership to any regulator like the Securities and Exchange Commission here in the United States. . . . Why is this important? It is important because it is clear evidence that the partnership did not exist." Counsel further argued: "Ladies and gentlemen, there is either a partnership or there is not. . . . And we know certainly, it was never written. As a matter of fact, there isn't even a memorandum or a note, nothing, [no] writing of any kind that was submitted by [Chugh] that you could say, here's proof, here's proof there was a partnership."

[17] Specifically, Chugh testified that, "in early 2004, we were having . . . lunch at a Chinese restaurant, and, at that time, I proposed that [we] partner up for this Indian real estate opportunity. We agreed that it was going to be a 50/50 partnership. In my mind at [the] time, you know, it was a pretty simple relationship. We trusted each other. We said everything is going to be equal . . . . And we're going to make decisions . . . completely equally on every single thing. . . . So, it was a 50/50 partnership in that every single decision that we made, whether it was any spending that we did, any employees that we hired, any offices that we opened, any strategic decisions that we made, any investments that we made, every single decision was unanimous, both of [us] checked with each other, and we agreed on it. If there was some disagreement between us, one of us convinced the other person . . . to go ahead or not to go ahead with [a] decision. But pretty much everything was unanimously decided between the two of us."

[18] We do not doubt that a properly instructed jury would have awarded

Chugh general damages given the jury's finding that Kalra acted with malice in publishing the 2013 press release and its award of punitive damages in connection with the libel claim. Indeed, it is clear that the jury struggled with the limitations imposed on it by the trial court's instructions with respect to the damages award, i.e., that special damages could be awarded *only* if the jury found that Chugh had proven lost profits—which he clearly had not proven—but, otherwise, the jury could award only nominal damages. This is evident in the jury's question asking the court whether there was an upper limit on the amount of nominal damages it could award. What we cannot determine, however, without resort to conjecture, is the *amount* of general damages that the jury would have awarded but for the trial court's error. It is for this reason that a new trial on the libel claim is required.

[19] We note that Kalra also sought plain error review of the trial court's instruction to the jury, in accordance with Kalra's request to charge, that Kalra bore the burden of proving the truth of the matter asserted in the 2013 press release. Because we conclude that Kalra is entitled to a new trial due to the court's error relative to the damages instruction, we need not decide whether he is entitled to plain error review of this additional instructional error claim.

---